JOURNAL ENTRY and OPINION.
{¶ 1} Plaintiff-appellant Hyosung (America), Inc. ("Hyosung") appeals the trial court's order granting a directed verdict in favor of defendant-appellee Star Bank n.k.a. Firstar ("Firstar"). Hyosung, a junior secured creditor, claims Firstar, the primary secured creditor, wrongfully repossessed and sold collateral in which both parties claimed an interest. Finding merit to the appeal, we affirm in part and reverse in part.
 {¶ 2} Hyosung, a Korean steel manufacturer, sold steel to Sheet Metal Manufacturing, Inc. ("Sheet Metal") through a line of credit that was subject to a UCC financing statement filed with the Ohio Secretary of State. In 1993, Sheet Metal sought to borrow $1.2 million from Firstar. Firstar agreed to the loan provided that all secured creditors with security interests in Sheet Metal's assets sign a subordination agreement placing Firstar first in line of priority.
 {¶ 3} Hyosung was the primary secured creditor prior to execution of the subordination agreement. In September 1993, Firstar sent the subordination agreement to Hyosung's office in Los Angeles. Hyun Chae ("Chae"), Hyosung's controller, reviewed the agreement and consulted Hyosung's local corporate lawyer in California. Chae, who had authority to bind Hyosung, agreed to execute the agreement placing Firstar first in line over Hyosung on the condition that Hyosung maintained second place behind Firstar. Hyosung became second in line of priority and all other creditors signed similar agreements.
 {¶ 4} In April 1996, Hyosung sent a letter to Firstar inquiring whether there was any change in Sheet Metal's financial status. In response, Firstar faxed a document to Hyosung that contained a handwritten note stating: "Account satisfactory per loan officer." However, the document also contained a typed disclaimer that stated: "The account(s) are part of a relationship in which all balances are invested. Therefore, accurate balance information is not available."
 {¶ 5} According to the terms of Sheet Metal's line of credit with Hyosung, Sheet Metal was to pay invoices for purchased steel every 30 days. By mid-1996, Hyosung was cognizant that Sheet Metal was experiencing financial problems because Sheet Metal failed to timely pay its invoices. Accordingly, Hyosung lowered Sheet Metal's credit limit from $300,000 to $200,000 during the second quarter of 1996.
 {¶ 6} Firstar also started to question Sheet Metal's creditworthiness. In June 1996, Firstar sent Sheet Metal a questionnaire regarding its finances. In July 1996, Firstar had an audit performed to review Sheet Metal's financial status. Eventually, Sheet Metal defaulted on its loans with Firstar. In October 1996, Firstar placed Sheet Metal's account into its Special Assets Division, which handled substandard loans. On October 25, 1996, Firstar's counsel sent a letter to Sheet Metal demanding payment on all outstanding balances. Joseph Bolan ("Bolan"), one of Sheet Metal's principals and personal guarantors, requested additional time to find a buyer for his business to satisfy Sheet Metal's loans and Bolan's personal guarantees. Firstar agreed to his request because it believed the owner of the company would have contacts in the industry and would be in a better position to find potential buyers.
 {¶ 7} When Bolan failed to find a buyer by the end of November 1996, Firstar proceeded with foreclosure. In January 1997, Firstar filed a complaint for default of the loan and a motion for replevin in the Cuyahoga County Court of Common Pleas. By this time, Sheet Metal was also in default to Hyosung, although no action was commenced by Hyosung until June 1997.
 {¶ 8} While Firstar's foreclosure was pending, Bolan continued to search for a buyer for his business. He received letters of intent from two potential buyers: Automated Ductwork Manufacturing Company ("Ductwork") and Rainaire Products of Alabama, a division of American Duct Pipe, Inc. ("Rainaire"). Neither of these buyers consummated a sale before Firstar and Sheet Metal settled the foreclosure action. In February 1997, counsel for Firstar and Sheet Metal signed an agreed judgment entry, in which Sheet Metal surrendered all of its right, title, and interest in its assets to Firstar. The agreed judgment entry allowed Bolan to retain possession of Sheet Metal's assets in order to maintain the company in "running condition," and to assist Firstar in the "secured party" UCC Article 9 sale.
 {¶ 9} Although the parties executed the agreement in February 1997, the agreed judgment entry was not journalized until March 19, 1997, after the court approved the agreed plan. Nonetheless, the parties began preparations for a secured party sale in February 1997. Sheet Metal's lawyer provided Firstar with "the names and addresses of all parties who may claim a secured interest in any asset of [Sheet Metal]."
 {¶ 10} The list of addresses failed to include Hyosung's current address. Although Hyosung had notified its customers, vendors, insurance company, and banks with which it held accounts or other account-related business of its change of address, it did not change its address with the Ohio Secretary of State. Thus, when Firstar sent notices of the secured party sale to Sheet Metal's other secured creditors, it mailed Hyosung's notice to its previous address on file with the Secretary of State. As a result, Hyosung never received the notice.
 {¶ 11} At the time of the sale, Rainaire and Ductwork were the only two bidders. Rainaire offered to purchase Sheet Metal for $1,322,000. Ductwork offered $938,224.53. Firstar accepted Ductwork's offer because Ductwork was able to pay cash on the day of sale, whereas Rainaire did not have complete financing available.
 {¶ 12} Hyosung's complaint against Firstar alleged that Firstar failed to conduct a commercially reasonable secured party sale, fraud, and unjust enrichment. After four days of trial, the court granted Firstar's motion for directed verdict on all of Hyosung's claims. Hyosung filed a timely notice of appeal.
 {¶ 13} Hyosung raises four assignments of error which challenge the trial court's granting a directed verdict as to each of Hyosung's claims for relief. Civ.R. 50(A)(4), which defines the test that is to be applied to a motion for directed verdict, provides that:
"(4) When granted on the evidence. When a motion for a directed verdicthas been properly made, and the trial court, after construing theevidence most strongly in favor of the party against whom the motion isdirected, finds that upon any determinative issue reasonable minds couldcome to but one conclusion upon the evidence submitted and thatconclusion is adverse to such party, the court shall sustain the motionand direct a verdict for the moving party as to that issue."
 {¶ 14} A motion for directed verdict tests the legal sufficiency of the evidence presented; accordingly, neither the weight of the evidence nor the credibility of witnesses may be considered. Cater v.Cleveland (1998), 83 Ohio St.3d 24, 33, citing Strother v. Hutchinson
(1981), 67 Ohio St.2d 282. In addition, all reasonable inferences that may be drawn from the evidence must be made in favor of the non-moving party. Rinehart v. Toledo Blade Co. (1985), 21 Ohio App.3d 274. If substantial, competent evidence has been presented from which reasonable minds could draw different conclusions, the motion must be denied. Wagnerv. Roche Laboratories, Inc. (1996), 77 Ohio St.3d 116, 119.
 {¶ 15} Because a directed verdict presents a question of law, we review the trial court's judgment de novo. Hardy v. General Motors Corp.
(1998), 126 Ohio App.3d 455, 462, citing Howell v. Dayton Power Light Co. (1995), 102 Ohio App.3d 6, 13.
 Commercial Reasonableness {¶ 16} In its first assignment of error, Hyosung argues Firstar's secured party sale was commercially unreasonable because the sale price was deficient. Specifically, Hyosung claims Firstar should have accepted Rainaire's offer because it was significantly higher than Ductwork's offer and it would have repaid Firstar and the other creditors including Hyosung. Hyosung concludes that in light of the evidence of such a large difference in price, reasonable minds would have concluded that the sale was conducted in a commercially unreasonable manner.
 {¶ 17} The Ohio Supreme Court has held that "whether a sale of collateral is commercially reasonable will turn upon all the facts in a particular case. Price alone is not the determinative factor." HuntingtonNatl. Bank v. Elkins (1990), 53 Ohio St.3d 79, 81. Although there was undisputed evidence that Rainaire's offer was over $300,000 more than Ductwork's offer, there was also evidence that Ductwork was able to pay cash while Rainaire did not have financing available to make good on its offer. In fact, the president of Rainaire testified that Rainaire asked Firstar to finance the purchase, but Firstar was unwilling to do so because Rainaire already had a financing arrangement with Firstar and was in default under the terms of the loan. (Tr. 228). In Elkins, supra, the Ohio Supreme Court explained that illusory offers cannot support a claim of commercial unreasonableness. Id. at 82.
 {¶ 18} Furthermore, Hyosung did not present any evidence as to the commercially reasonable value of Sheet Metal's assets. The only evidence of the commercially reasonable value of Sheet Metal's assets came from Firstar's appraiser who stated in his report that the appraisal value of Sheet Metal's assets ranged between $552,775 to $830,300. Therefore, because Ductwork's final purchase price of $938,224.53, which was paid in cash, was more than the appraisal value, it cannot be said that the sale price was deficient.
 {¶ 19} Hyosung also argues that Firstar's notice of sale was commercially unreasonable because it is unclear whether it provided notice of a public or private sale. Hyosung claims the terms of the notice suggest a public sale was intended because it states that "the secured party reserves the right to accept higher bids." Hyosung's expert, Richard Baumgart ("Baumgart") testified that in private sales, the secured party does not generally take higher bids. Baumgart also testified that while the notice suggested a public sale, there was no indication of advertising. Baumgart explained that without advertising, there can be no public sale.
 {¶ 20} However, Baumgart also admitted that the notice, on its face, expressly states the sale would be a "private sale." Baumgart also admitted that nowhere does the notice state that the sale would be a "public sale." Finally, Baumgart admitted that there is nothing in the statute governing secured party sales that prohibits a creditor from including other parties in a private sale. Indeed, the only requirement for a notice of private sale under R.C. 1309.47(C) is that "the debtor be informed of the date after which the property will be sold." Liberty Bankv. Greiner (1978), 62 Ohio App.2d 125, 129. Firstar's notice of sale not only provided the statutory requirement of the date of sale, but also included the time of sale. Therefore, because the uncontroverted evidence proved the notice was for a private sale and complied with Ohio law governing private secured party sales, the notice properly provided notice of a private sale.
 {¶ 21} Hyosung also argues that the secured party sale was commercially unreasonable because Firstar failed to give Hyosung notice of the sale. However, R.C. 1309.47 does not require notice be given to any junior creditors such as Hyosung, unless the junior creditor requests such notification in writing. R.C. 1309.47(A)(3). See, also, Ramsey v.Ernoko, Inc. (1991), 74 Ohio App.3d 749, 753. There was no evidence that Hyosung made such a request in writing. Therefore, Firstar's failure to notify Hyosung of the secured party sale did not render the sale commercially unreasonable.
 {¶ 22} Finally, Hyosung argues Firstar's notice of sale was commercially unreasonable because it chilled the bidding process by making reference to a right of first refusal. Baumgart testified that the right of first refusal chilled the bidding process. Specifically, Baumgart stated:
"They know, they put their best foot forward, and at the last minute,the first guy who was there, who has been looking at this stuff * * * cansay now that you pushed me up a little bit, now I'm going to take the bidaway from you. I'm going to outbid you. I have the last bid, and itchills the sale." (Tr. 121).
 {¶ 23} Although it is questionable whether the right of first refusal would in fact chill the bidding process, we are bound to accept this testimony as true for purposes of a directed verdict. Civ.R. 50 requires that the court construe the evidence most strongly in favor of the non-moving party and prohibits the court from weighing the evidence or questioning the credibility of any witness. The Limited Stores, Inc.v. Pan American World Airways, Inc. (1992), 65 Ohio St.3d 66; Blair v.Property Mgmt. Consultants (1987), 40 Ohio App.3d 103. Obviously, if the bidding process were chilled, it would be almost impossible to maximize the proceeds from the sale, and the sale would be commercially unreasonable. Therefore, the first assignment of error is well taken.
 Negligent Misrepresentation {¶ 24} In its second assignment of error, Hyosung argues the trial court erred in granting Firstar's motion for directed verdict on Hyosung's negligent misrepresentation claim.[1] The Ohio Supreme Court has stated that negligent misrepresentation is established by proof showing that the defendant, while acting in the course of a business in which he has a pecuniary interest, failed to exercise due care or competence and supplied false information for the guidance of others in a business transaction, and by proof that the others justifiably relied on the information. Delman v. Cleveland Heights (1989), 41 Ohio St.3d 1, 4.
 {¶ 25} Hyosung argues that Firstar promised to "watch out" for Hyosung's interests when Hyosung signed the subordination agreement. Robert Hicks, an agent of Hyosung, testified that Brad Wheeler of Firstar told him Firstar would "watch out" for Hyosung's interest. Hyosung implies that it relied upon this representation when it executed the subordination agreement. However, Hicks admitted that Wheeler made that statement to him after the subordination agreement had been executed. Therefore, there could be no reliance and thus no negligent misrepresentation arising from that statement.
 {¶ 26} Hyosung also argues that Firstar gave false information regarding Sheet Metal's financial status. In April 1996, Hyosung sent a letter to Firstar inquiring whether there was any change in Sheet Metal's financial status. In response, Firstar faxed a document to Hyosung that contained a handwritten note stating that Sheet Metal's account was satisfactory. However, the document also contained a disclaimer that stated: "The account(s) are part of a relationship in which all balances are invested." Hyosung claims it relied on Firstar's representation that Sheet Metal's financial condition was "satisfactory" when it continued to deal with Sheet Metal.
 {¶ 27} Whether Hyosung was justified in relying on the handwritten note stating that Sheet Metal's account was satisfactory when there was a disclaimer on the page is a question of fact that should have been left for the jury to decide. The document contained conflicting information. The disclaimer was typed and appeared to be preprinted on the document. Yet, the statement that Sheet Metal's account was satisfactory was handwritten, suggesting perhaps Firstar was offering accurate account information. Thus, reasonable minds could conclude that the reliance on the handwritten note was justified. Therefore, a directed verdict on this issue was improper.
 {¶ 28} Accordingly, the second assignment of error is sustained.
 Intentional Fraud and Fraud by Omission {¶ 29} In its third assignment of error, Hyosung argues the trial court erred in granting a directed verdict on Hyosung's fraud claim because reasonable minds could have concluded that Firstar intentionally failed to "watch out" for Hyosung's interest despite its representation that it would do so; that Firstar failed to inform Hyosung of Sheet Metal's financial difficulties; and that Firstar failed to inform Hyosung of the secured party sale and previous offers to purchase Sheet Metal.
 {¶ 30} A claim of fraud contains the following elements: (a) a representation or, where there is duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance. Gaines v.Preterm-Cleveland, Inc. (1987), 33 Ohio St.3d 54, 55. An appellate court will not reverse the trial court's judgment where that court's judgment is supported by competent, credible evidence going to all the essential elements of the case. Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77.
 {¶ 31} The first part of Hyosung's fraud claim is based upon Firstar's alleged failure to abide by its promise that it would "watch out" for Hyosung's interests. Again, Hyosung argues it would not have agreed to sign the subordination agreement if Firstar had not promised to watch out for Hyosung's secured interests in Sheet Metal. However, as previously mentioned, Wheeler, the Firstar employee who allegedly stated he would "watch out" for Hyosung's interests, made this statement to one of Hyosung's salesmen after Hyosung had already signed the agreement. Therefore, Hyosung did not rely on this statement when it executed the agreement and there can be no fraud claim arising from that statement.
 {¶ 32} Hyosung also claims Firstar intentionally misrepresented Sheet Metal's financial status when it faxed the document containing the handwritten note stating that Sheet Metal's account was satisfactory. Hyosung claims this was an intentional misrepresentation because Firstar had information prior to this April 1996 communication suggesting Sheet Metal was having financial difficulties. In support of this claim, Hyosung relies on two internal documents Firstar generated with regard to Sheet Metal's account.
 {¶ 33} The first document (Plaintiff's Exhibit 5), dated December 22, 1995, simply stated that the bank granted Sheet Metal a 90-day extension on its revolving line of credit. It also stated that the credit was being downgraded "due to the lack of timely financial information." The document does not provide any indication that Sheet Metal was making any late payments or that Sheet Metal was in default. Therefore, it does not establish proof that Firstar knew or suspected that Sheet Metal was having financial difficulties at that time.
 {¶ 34} The second document (Plaintiff's Exhibit 11) is dated October 30, 1996, more than six months after Firstar provided Hyosung with a credit reference concerning Sheet Metal's account. Therefore, this document cannot constitute proof that Firstar was aware of Sheet Metal's financial difficulties in April 1996 when it gave Hyosung the credit reference.
 {¶ 35} There is no evidence that Sheet Metal's account with Firstar was anything but satisfactory at the time Firstar made that representation to Hyosung. Moreover, the evidence demonstrates that Hyosung became aware of Sheet Metal's financial problems before Firstar. Testimony at trial revealed that Hyosung first suspected Sheet Metal's financial downturn in April 1996 and lowered its credit limit in June 1996. Indeed, Hyosung reduced Sheet Metal's credit limit due to its failure to make its monthly payments in a timely fashion. Firstar did not turn Sheet Metal's account over to the Special Assets Division until October 24, 1996. Without evidence that Firstar intentionally misrepresented Sheet Metal's financial status, there can be no claim for fraud.
 {¶ 36} Finally, Hyosung argues Firstar fraudulently failed to give Hyosung notice that Sheet Metal's assets were going to be sold in a "secured party sale" and that Rainaire and Ductwork were making offers. However, Firstar was not obligated to notify Hyosung of an impending sale. R.C. 1309.47 does not require notice of the disposition be given to any junior creditors such as Hyosung, unless the junior creditor first requests such notification in writing. R.C. 1309.47(A)(3). See also,Ramsey, supra, holding that "[a] secured party need not give notice of the disposition of collateral to another secured party unless the party disposing of the collateral receives written notice from the junior secured party of that party's interest in the collateral." There is no evidence that Hyosung notified Firstar or requested notice of a secured party sale. Without a duty to provide notice, Firstar cannot be liable for fraud by omission for not providing such notice. Therefore, the trial court properly granted a directed verdict on Hyosung's fraud claim.
 {¶ 37} Accordingly, the third assignment of error is overruled.
 Conversion and Unjust Enrichment {¶ 38} In its fourth assignment of error, Hyosung argues the trial court erred in directing a verdict on its claims for conversion and unjust enrichment because reasonable minds could have concluded that Firstar wrongfully took possession of and sold Hyosung's steel which was being stored at Sheet Metal's facility.
 {¶ 39} However, Hyosung's claims for conversion and unjust enrichment were pled in the complaint with regard to the proceeds of the sale of Sheet Metal's assets at the secured party sale. Hyosung's argument on appeal, that Firstar wrongfully sold Hyosung's steel which was stored at Sheet Metal's facility, was never alleged in the pleadings nor was there any amendment to the pleadings that would present such a claim. "Ordinarily, reviewing courts do not consider questions not presented to the court whose judgment is sought to be reversed." Porterv. Dept. of Public Safety (1998), 84 Ohio St.3d 258, 259, quoting, Stateex rel. Quarto Mining Co. v. Foreman (1997), 79 Ohio St.3d 78, 81;Goldberg v. Indus. Comm. (1936), 131 Ohio St. 399, 404, 6 Ohio Op. 108, 110.
 {¶ 40} Accordingly, Hyosung's fourth assignment of error is overruled.
Judgment affirmed in part and reversed in part. Case remanded for further proceedings consistent with this opinion.
FRANK D. CELEBREZZE, JR., P.J. and TIMOTHY E. McMONAGLE, J. concur.
[1] Although Hyosung's complaint did not state a claim for negligent misrepresentation, the trial court allowed Hyosung to present this claim by amending the complaint to conform to the evidence pursuant to Civ.R. 15(B).