CLAPP, Appellee,

v.

MUELLER ELECTRIC COMPANY et al., Appellants.

[Cite as *Clapp v. Mueller Elec. Co.*, 162 Ohio App.3d 810, 2005-Ohio-4410.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 85447.

Decided Aug. 25, 2005.

Timothy A. Shimko, for appellee.

Reminger & Reminger Co., L.P.A., Jonathan T. Hyman, and Andrew A. Kabat, for appellants.

CHRISTINE T. MCMONAGLE, Judge.

{¶ 1} Plaintiff-appellee, Harry S. Clapp, is the former chief financial officer ("CFO") of defendant-appellant, Mueller Electric Company ("Mueller Electric" or "Mueller"). After his employment was terminated, Clapp sued defendants-appellants, Mueller Electric, Brighton Manor Corporation ("Brighton Manor"), and E. Scott Emerson (the owner of both companies), for monies owed him as a result of services he provided to Mueller and Brighton Manor for which he was not paid. Clapp's complaint asserted claims for breach of contract, unjust enrichment, and promissory estoppel; he subsequently dismissed the promissory-estoppel claim.

{¶ 2} Clapp, a certified public accountant ("CPA"), testified at trial that he was hired as Mueller's CFO in November 1996 at an annual salary of $65,000. In November 1997, Emerson terminated Mueller's chief executive officer ("CEO") and asked Clapp to perform the CEO duties, in addition to his duties as CFO, while Emerson searched for a permanent CEO. Contemporaneous with his appointment as CEO, Clapp received a raise and a bonus. In November 1998, after his annual performance review, Emerson increased Clapp's salary to $78,000 per year and gave him a 30 percent bonus. In November 1999, Emerson again reviewed Clapp's performance, increased his salary to $95,000 per year, and gave him a 30 percent bonus. From the time he was hired by Mueller until December 1999, Clapp performed work only for Mueller.

{¶ 3} Sometime in 1997 or 1998, Emerson terminated the controller of Brighton Manor, which owns and operates four hotels in northern Ohio, and hired an accounting firm to oversee the financial operations of the hotels. In late 1999, however, Emerson became aware that the accounting firm had been having difficulty handling the bookkeeping and accounting functions of Brighton Manor. Emerson approached Clapp and asked him to review the books and bookkeeping procedures and advise him of the extent of the problems.

{¶ 4} Over a two-week period in January 2000, Clapp familiarized himself with the operation of Brighton Manor. He learned that no bank reconciliations had been performed in the previous 18 months for any of the four hotels owned and operated by Brighton Manor. He also discovered that the controllers working at the various hotels were not properly trained or experienced and that there were not proper bookkeeping procedures in place at any of the four hotels. In short, according to Clapp, "there was a complete collapse of the accounting system."

{¶ 5} Clapp reported to Emerson that Brighton Manor's books were $800,000 out of balance. He further advised Emerson that to bring the books in balance, hundreds of thousands of transactions had to be traced, but the task would be very complicated because all the transactions from the four hotels were intermin-

gled in one joint bank account. Clapp further advised Emerson that accounting procedures would have to be designed and implemented and the accounting staff at the hotels would need to be trained or replaced.

{¶ 6} Clapp and Emerson then discussed various options for solving the problems. Clapp advised Emerson that he could either hire an outside accounting firm to create a new accounting system and train new personnel at each of the four hotels at a cost of approximately $200,000 or hire an experienced CFO for Brighton Manor, at an approximate salary of $125,000.

{¶ 7} Instead, in February 2000, Emerson approached Clapp and asked him if he would "be interested in taking on this task and coming into this organization and fixing these problems." Clapp testified that he had told Emerson that taking on the additional duties at Brighton Manor would involve a lot more work and had asked him what he would be compensated for these substantial extra duties. According to Clapp, Emerson told him:

{¶ 8} "Harry, if you get this, if you come in and do what you tell me you can do, if you fix this problem, I will—if you handle the books of Brighton for me and do what you tell me you can do, I will pay you fairly."

{¶ 9} From February 2000 until he was terminated in May 2001, Clapp continued to perform his CEO and CFO duties at Mueller Electric, and, additionally, he worked as CFO at Brighton Manor. Clapp testified that in addition to his normal hours at Mueller Electric, he spent an average of 30 hours per week in the evenings and on weekends designing and implementing a new accounting and bookkeeping system for Brighton Manor. Further, he hired and trained personnel to operate the new system and supervised the individuals who were working at balancing the books. Clapp initially gave Emerson frequent updates regarding his progress, but after Emerson told him that he was not interested in Clapp's schedule, he gave Emerson less frequent updates.

{¶ 10} By February 2001, Clapp had completed the task of balancing Brighton Manor's books and implementing a new bookkeeping system. When he approached Emerson regarding the promised payment, however, Emerson told Clapp that he would pay him only after an outside accounting firm reviewed the procedures that Clapp had put into place and "signed off on it." After the accounting firm completed its audit and signed off on Clapp's work, Clapp again approached Emerson regarding payment. This time, Emerson told Clapp that he wanted an outside consultant by the name of Ala Deen to review Clapp's work.

{¶ 11} Although Clapp correctly surmised that Emerson had actually hired Deen to replace him at Brighton Manor, Clapp advised and trained Deen regarding the procedures he had spent the past year implementing.

{¶ 12} On May 1, 2001, after Clapp had completed Deen's training, Emerson advised Clapp that he was terminated effective immediately. In light of Clapp's senior position at Mueller, however, Emerson asked Clapp to report on various issues and strategies, including the company's union, insurance, and vendor contracts, and the company's decision to move its Cleveland operation to China. Because his employment had been terminated, Clapp informed Emerson that he wanted severance pay in exchange for the reports. Clapp testified:

{¶ 13} "Well, at this point, I had been burned a couple times. I was finally waking up a little bit. And I said: Look it, let's talk about a severance package first.

{¶ 14} "So we started talking about a severance package. And I very clearly, right up front, I said: Look it, I'm looking for a six-month package. * * * The bottom line is, I said: Scott, I expect a six-month. Is that what we're talking about? He nodded his head. That's where we left it at."

{¶ 15} Thereafter, Clapp spent several days developing a list of key issues regarding Mueller Electric. He then met with Emerson for several hours regarding the report. At the conclusion of the meeting, Clapp asked Emerson about his severance package. Emerson "hemmed and hawed" and then told Clapp that he had not yet had time for his lawyers to draw up the agreement but that it would be forthcoming.

{¶ 16} Over the next several days, Clapp called Emerson several times. He did not speak with Emerson directly, but left several messages for him on his voicemail. Emerson did not return the messages, but then several days later, he called Clapp and, in an angry tone, accused him of unspecified wrongdoing and told him that he would not be paid for his work at Brighton Manor and would not be receiving any severance pay.

{¶ 17} Emerson testified for the defense and said that he had given Clapp the responsibility of fixing the problems at Brighton Manor because Clapp had "gotten things working very smoothly at Mueller" and that Emerson had believed that Clapp had time to take on other responsibilities. According to Emerson, he and Clapp never had any discussions regarding additional compensation for Clapp's work at Brighton Manor.

{¶ 18} Emerson testified that Clapp initially told him that the books at Brighton Manor were several hundred thousand dollars out of balance, and he was surprised to learn from Clapp in December 2000 that the books were actually $800,000 out of balance, after Clapp had been working on the project for nearly a year. Emerson testified further that he had told Clapp that he wanted him to "roll up his sleeves" and get the books balanced and the cash accounts reconciled by the year-end close.

{¶ 19} According to Emerson, he told Clapp that he "would think about it and get back to him" when Clapp asked him about a severance payment, and he denied nodding his head in agreement when Clapp stated that he was entitled to six months' severance pay. Emerson testified that he talked about "open issues" at Mueller Electric with Clapp after he was terminated, but could not recall receiving a memo from Clapp about those issues.

{¶ 20} Upon cross-examination, Emerson testified that upon learning of the enormity of the accounting problems at Brighton Manor, he knew that he would need to hire either an outside accounting firm or a CFO to fix the problems, but instead he had asked Clapp to do the work. Emerson testified further that he had been upset when he learned, after Clapp was terminated, that Clapp had written off approximately $72,000 to balance the books at Brighton Manor. Emerson admitted, however, that during his deposition, he had testified that Clapp had written off approximately $35,000 to balance the books. Emerson further admitted that the outside accounting firm that reviewed Clapp's finished work at Brighton Manor had no criticisms regarding his work. Emerson also admitted that he had lied when he told Clapp that Deen was an outside consultant at Brighton Manor when, in fact, Emerson had already hired him as the new CFO for the company. Finally, Emerson testified that he had decided not to pay Clapp any severance pay after he learned from Judith Little, his assistant, on May 2, 2001, that Clapp had loaned her company money in violation of company policy.

{¶ 21} John Phillips, a former controller for Mueller Electric, testified that he and Little helped reconcile the books at Brighton Manor. According to Phillips, Clapp supervised the project and got involved in the actual reconciliation work only after December 2000, when it was determined that the books were approximately $800,000 out of balance. Phillips testified that he had worked on the Brighton Manor project approximately two days per month.

{¶ 22} Little, called on cross-examination by the plaintiff, testified that she had first told Emerson in February 2002, after Clapp filed his lawsuit and nearly a year after his termination, that Clapp had authorized a personal loan to her from the company. Little emphatically denied telling Emerson about the loan in May 2001, when Clapp was terminated.

{¶ 23} On the next day of trial, defense counsel called Little on direct examination. Little then suddenly changed her testimony regarding when she first told Emerson that Clapp had authorized a company loan to her. Little testified that she actually told Emerson about the company loan in May 2001, when she became involved in preparing Mueller Electric's response to a document entitled "Request for Information" from the Ohio Department of Job and

Family Services regarding Clapp's request for unemployment compensation. Little noted that the document was mailed to Mueller on May 22, 2001.

{¶ 24} In light of this dramatic and unexplained change in testimony, upon cross-examination, appellee's counsel asked Little whether she had discussed the document, Clapp's personnel file, or her testimony with defense counsel between the time of her previous testimony and her altered testimony. Little responded "no" to each question. When appellee's counsel then asked, "[W]ell, what did you discuss with these lawyers?" the trial court sustained defense counsel's objection.

{¶ 25} The trial court denied defense counsel's motions for a directed verdict, both at the conclusion of appellee's case-in-chief and at the conclusion of all the evidence. The jury returned a general verdict in favor of Clapp, awarding him $115,000. This appeal followed.

## CLAPP'S TESTIMONY REGARDING THE VALUE OF HIS SERVICES

{¶ 26} Clapp testified on direct examination that he had been a CPA for over 15 years. He testified further that in light of his experience working with and reviewing the bills from public accounting firms over the past 20 years, he was aware of what the hourly rate for a licensed CPA with 15 years of experience was. Clapp then opined that the value of his services as a licensed CPA was anywhere from $125 to $175 per hour and that, calculating his rate at $150 per hour, the value of the services he had provided to Brighton Manor was $232,000.

{¶ 27} In their first assignment of error, appellants argue that the trial court committed reversible error in allowing Clapp to testify, over their objection, to the value of his services because he was not qualified as an expert witness.

{¶ 28} The admission or exclusion of evidence rests within the sound discretion of the trial court. *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343. In order to find an abuse of that discretion, we must find that the trial court's decision to admit or exclude the evidence was arbitrary, unreasonable, or unconscionable and not merely an error of judgment. *State v. Xie* (1992), 62 Ohio St.3d 521, 584 N.E.2d 715.

{¶ 29} A witness need not be qualified as an expert to testify regarding the value of his own services. In *Mid–States Dev. Co. v. Celotex Corp.* (Aug. 29, 1983), Montgomery App. No. CA 7469, 1983 WL 4943, for example, a witness testified regarding the reasonable value of services rendered for repair and replacement of a roof. Appellant objected that the testimony was improper because the witness had not been qualified as an expert. In affirming the trial court's ruling that the witness need not be an expert to testify as to the value of services he had provided, the Second District stated, "[V]alue of services requires

a familiarity with the subject and does not require, as implied here, the qualification of a witness designated as an expert." Id.

{¶ 30} Similarly, in *Rose v. Brandewie* (1950), 101 N.E.2d 219, the court held that witnesses who were not qualified as experts had properly testified regarding the value of board, lodging, and laundry services provided to defendant's decedent. The court noted that knowledge of the value of the services rendered did not depend on professional or special skill that would qualify the witnesses as experts, but could be had and testified to by persons who had gained their knowledge through experience and observation. See, also *Frank v. Frank* (Dec. 23, 1930), 9th Dist. No. 542, 1930 WL 2302 (plaintiff not required to be qualified as an expert to testify regarding the value of the services he provided on defendant's farm).

{¶ 31} There is no question that, in this case, Clapp had sufficient experience to testify regarding the value of services he rendered as CFO to Brighton Manor. The testimony at trial demonstrated that Clapp had been a CPA involved in accounting and financial work for many years, that he had performed such services at Mueller Electric for nearly five years, and that he had performed similar services at Brighton Manor. Thus, Clapp clearly was familiar with the services rendered.

{¶ 32} Appellants contend that Clapp's testimony was improper, however, because he actually gave expert testimony without being qualified as an expert or submitting an expert report. They assert that because Clapp testified that the hourly rate for a CPA with 15 years of experience is anywhere from $125 to $175 per hour, he actually testified regarding the market rate for his services, which is a subject for expert testimony. We disagree.

{¶ 33} The record reflects that Clapp testified that in light of his extensive experience, *his services* as a CPA were worth anywhere from $125 to $175 per hour. Although he testified that he knew what the hourly rate of a licensed CPA in Ohio with 15 years of experience was, he did not testify as to what that rate was because appellants' counsel objected to his answer. Thus, Clapp testified as to his own value, not the market value for every CPA with 15 years of experience.

{¶ 34} Moreover, even if the admission of Clapp's testimony regarding the value of his services were in error, we would find the error to be harmless. Emerson testified that Clapp advised him it would cost approximately $200,000 for an outside accounting firm to fix the problems at Brighton Manor, or $125,000 for a CFO to do the work. The jury returned a verdict of $115,000, below this range. Accordingly, Clapp's testimony that the value of the services he rendered to Brighton Manor was $232,000 does not appear to have influenced the jury.

{¶ 35} Because the trial court did not abuse its discretion in allowing Clapp to testify regarding the value of his services, appellants' first assignment of error is overruled.

## APPELLANTS' MOTIONS FOR DIRECTED VERDICT

{¶ 36} In their second assignment of error, appellants contend that the trial court erred in denying their motions for directed verdict.

{¶ 37} According to Civ.R. 50(A)(4), a motion for directed verdict is granted if, after construing the evidence most strongly in favor of the party against whom the motion is directed, "reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." The "reasonable minds" test mandated by Civ.R. 50(A)(4) requires the court to discern only whether there exists any evidence of substantive probative value that favors the position of the nonmoving party. Civ.R. 50(A)(4); *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 69, 23 O.O.3d 115, 430 N.E.2d 935.

{¶ 38} "A motion for directed verdict * * * does not present factual issues, but a question of law, even though in deciding such a motion, it is necessary to review and consider the evidence." *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896, paragraph three of the syllabus. See, also, *Wagner v. Roche Laboratories* (1996), 77 Ohio St.3d 116, 119, 671 N.E.2d 252. Because we are presented with a question of law, we apply a de novo standard of review. *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, at ¶ 4.

{¶ 39} Appellants argue that both of Clapp's claims were deficient for various reasons. They contend that there was insufficient evidence to support Clapp's breach-of-contract claim because Emerson's statement that he would pay Clapp "fairly" for his work at Brighton Manor fails to establish the contract price, one of the essential elements of a claim for breach of contract. Likewise, they claim that there was insufficient evidence to support Clapp's claim for severance pay because a nod of the head is insufficient to establish an agreement, and even if it were sufficient, Emerson's nod of the head indicated only an agreement to make an agreement in the future regarding Clapp's severance, which appellants claim is unenforceable under these circumstances. Finally, they argue that Clapp's claim for unjust enrichment fails because he did not confer any benefit on Brighton Manor.

{¶ 40} We address Clapp's unjust-enrichment claim first. This court set forth a synopsis of the law of unjust enrichment in *Donovan v. Omega World Travel, Inc.* (Oct. 5, 1995), Cuyahoga App. No. 68251, 1995 WL 588721:

{¶ 41} "Generally speaking, a claim for unjust enrichment lies whenever a benefit is conferred by a plaintiff upon a defendant with knowledge by the defendant of the benefit and retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. * * * Civil liability may be imposed where one party retains a benefit from another's labors. This implied obligation (i.e., quasi contract) is derived from the equitable principle 'based on the moral obligation to make restitution which rests upon a person who has received a benefit which, if retained by him, would result in inequity and injustice.' In order to prevent such unjust enrichment, the law implies a promise to pay a reasonable amount for services in the absence of a specific contract." (Citations omitted.)

{¶ 42} In order to recover under a theory of unjust enrichment, a plaintiff must demonstrate the following: 1) a benefit conferred by the plaintiff upon the defendant, 2) knowledge by the defendant of the benefit, and 3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. *Guardian Technology v. Chelm Properties* (Sept. 19, 2002), Cuyahoga App. No. 80166, 2002 WL 31087415, citing *Hambleton v. R.G. Barry Corp.* (1984), 12 Ohio St.3d 179, 183, 12 OBR 246, 465 N.E.2d 1298.

{¶ 43} Appellants contend that there is no evidence that Clapp conferred a benefit on Brighton Manor. They argue that "instead of rolling up his own sleeves, and putting pencil to paper" to perform the actual bank reconciliations, he delegated those responsibilities to two subordinates. They further contend that Clapp did not tell Emerson until December 2000 that the books were $800,000 out of balance, after the Brighton Manor project had been ongoing for nearly one year. Finally, they contend that Clapp did not confer any benefit on Brighton Manor, because he wrote off $165,394.27 in 2001 to bring the accounts into balance. Accordingly, they assert, there was no evidence to justify a payment to Clapp.

{¶ 44} Appellants conveniently ignore Clapp's testimony, however. Clapp testified that he told Emerson in January 2000, after he had spent several weeks investigating Brighton Manor's operation, that the accounting system at Brighton Manor was in shambles, and that the books were $800,000 out of balance. He further testified that in addition to his normal work hours at Mueller Electric, from January 2000 to May 2001, he spent an average of 30 hours per week designing and implementing a new accounting and bookkeeping system at Brighton Manor. Clapp admitted that he had delegated much of the "grunt work" associated with the bank reconciliations to his subordinates, but testified that he had supervised those persons and had hired and trained personnel at each of the four hotels to operate the new system. Clapp further admitted that he wrote off some monies to bring the books into balance, but testified that the

write-offs were based on his professional judgment that it was not cost effective to spend more time searching for the lost dollars. Appellants also ignore Emerson's own testimony that the independent accounting firm that reviewed Clapp's work raised no concerns about the processes he had put into place or the books themselves.

{¶ 45} Construing this evidence in a light most favorable to Clapp, as required by Civ.R. 50(A)(4), it is apparent that reasonable minds could conclude there was evidence of substantive probative value that Clapp conferred a benefit upon Brighton Manor. Accordingly, the trial court properly denied appellants' motion for a directed verdict regarding Clapp's unjust-enrichment claim.

{¶ 46} As part of this assignment of error, appellants also contend that the verdict was against the weight of the evidence. Judgments that are supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by the reviewing court as being against the manifest weight of the evidence. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273.

{¶ 47} With respect to Clapp's unjust-enrichment claim, we note that, for the reasons discussed above, there was sufficient evidence that Clapp had conferred a benefit on Brighton Manor. In addition, there was evidence that Emerson had asked Clapp to perform the services at Brighton Manor and, thus, that he knew of the benefit being conferred. Finally, there was evidence that Emerson promised to pay Clapp "fairly" for the services he performed at Brighton Manor, and, therefore, the jury could have reasonably concluded that it would be unjust for Emerson to retain that benefit without paying for it. Each element of Clapp's unjust-enrichment claim was supported by competent credible evidence, and, therefore, the jury verdict in favor of Clapp on this claim was not against the manifest weight of the evidence.

{¶ 48} Because the jury rendered a general verdict, without any interrogatories, we are not able to discern from the record whether the jury found in favor of Clapp on his breach-of-contract claim, unjust-enrichment claim, or both. However, because there was sufficient evidence to support the jury's verdict in favor of Clapp regarding his unjust-enrichment claim for the services he rendered at Brighton Manor and the verdict was not against the manifest weight of the evidence, we need not address appellants' arguments regarding Clapp's breach-of-contract claim or his claims for severance pay.

{¶ 49} Appellants' second assignment of error is therefore overruled.

## ATTORNEY–CLIENT PRIVILEGE

{¶ 50} In their third assignment of error, appellants argue that the trial court committed reversible error in allowing Clapp's counsel to question Little,

upon her change in testimony regarding when she first told Emerson that Clapp had loaned her company money, as to whether she had discussed Clapp's personnel file, the "Request for Information" letter from the Ohio Department of Job and Family Services, or her testimony with defense counsel between the time of her previous testimony and the time of her altered testimony. Appellants contend that because Little was their employee, any conversations she had with defense counsel were protected by attorney-client privilege.

{¶ 51} Generally, communications between an attorney and his or her client are privileged. See R.C. 2317.02(A). The term "client," as used in R.C. 2317.021(A), includes:

{¶ 52} "A person, firm, partnership, corporation, or other association that, directly or through any representative, consults an attorney for the purpose of retaining the attorney or securing legal service or advice from him in his professional capacity, or consults an attorney employee for legal service or advice, and who communicates, either directly or through an agent, employee, or other representative, with such attorney."

{¶ 53} In *Upjohn Co. v. United States* (1981), 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584, the United States Supreme Court addressed the attorney-client privilege as it applies to a corporate client and determined that the attorney-client privilege protects and prevents the disclosure of communications between a company's attorney and that company's employees.

{¶ 54} Appellants argue that in light of *Upjohn* and its progeny, any conversations between Little and defense counsel were privileged, and, therefore, the "trial court lacked the authority to compel Ms. Little to waive her employer's privilege and answer those questions."

{¶ 55} It is the *contents* of the communications that are privileged, however, not the mere fact that a communication took place. *Upjohn*, supra. Thus, the trial court properly allowed Clapp's counsel to inquire as to whether or not there had been any opportunity by appellants' counsel to influence Little's testimony, which had clearly undergone a radical transformation overnight. However, when appellee's counsel sought to inquire regarding the contents of any communications between Little and appellants' counsel, the trial court properly sustained counsel's objection. Accordingly, we find no error.

{¶ 56} Appellants' third assignment of error is therefore overruled.

Judgment affirmed.

CELEBREZZE JR., P.J., and KILBANE, J., concur.