DECISION AND JOURNAL ENTRY
{¶ 1} Appellants/Cross-Appellees Gary Cowling, Richard Cowling, Dianne Cowling, and Deanna Cowling (collectively "the Cowlings") have appealed from the decision of the Lorain County Court of Common Pleas.[1] Appellee/Cross-Appellant, the Estate of Grace L. Cowling has appealed from the trial court's decision granting Gary's motion for directed verdict as to Grace's claims of civil conspiracy and civil aiding and abetting. This Court reverses, enters judgments for the Cowlings on Appellee's claim for a constructive trust, and affirms the lower court judgment against Appellee on its claims for civil conspiracy and civil aiding and abetting.
 I {¶ 2} The facts are incorporated from the Cowlings' previous appeal, which was filed with this Court on October 16, 2001, and dismissed for lack of a final, appeable order on December 31, 2002. Estate of Cowling v. Estate of Cowling, 9th Dist. No. 01CA007944, 2002-Ohio-7312, at ¶ 11. Grace married Garnard Cowling in 1967. It was a second marriage for both Grace and Garnard. Gary, Richard, and Sandra Reddington are the children of Garnard's previous marriage. Dianne and Deanna are the spouses of Richard and Gary, respectively. Donel Sprenger and Anthony Sprenger are the children of Grace's previous marriage.
 {¶ 3} Grace and Garnard owned certain brokerage accounts and stock investments jointly with rights of survivorship (hereinafter the "Assets").[2] Appellee contended that Grace's mental faculties began to decline noticeably in 1995. Donel testified at trial that he became concerned about Grace's mental state in 1996. Dr. Mary Bischoff, a psychologist, testified that she examined Grace in January of 1999 and found that Grace suffered from a progressive dementia, which "generally involves a progression that can extend over years."[3] Dr. Bischoff opined that Grace had been suffering from dementia for years.[4] When asked, however, if Dr. Bischoff had actually made "a diagnosis of dementia[,]" the doctor was equivocal and responded: "I gave a diagnostic impression that was point in time." She explained that her "diagnostic impression was that there was support for a diagnosis of dementia[.]"
 {¶ 4} On July 16, 1996, Grace signed irrevocable stock powers that transferred the stocks that she previously held jointly with Garnard to Garnard's name alone.[5] Garnard then gifted the stock to his children over a period from December, 1996 through February, 1997. He also transferred other assets in the brokerage accounts into his own name alone and placed those assets into Transfer on Death ("TOD") accounts, naming his children as beneficiaries. After such transfers Grace retained assets in her own name, including real property, a limited partnership, and certificates of deposit. Garnard died on February 8, 1998. Gary, Sandra, and Richard received the proceeds of Garnard's TOD accounts.
 {¶ 5} Thus, this case does not involve the probate of property held jointly with rights of survivorship (hereinafter "jointly") after the death of one of the co-owners. Here the joint tenancy between Grace and Garnard as to the Assets was terminated before Garnard's death. Grace, however, did not challenge these transfer until after his death. While there is evidence that Donel became concerned about Grace's mental capacity, other than his efforts to interest Garnard in creating a trust for Grace's benefit, there is no evidence that either Donel or Anthony took any legal action to protect Grace from her own alleged mental incapacity.
 {¶ 6} Grace filed a complaint on October 16, 1998,[6]
and later, two amended complaints, naming the Estate of Garnard H. Cowling (hereinafter "the Estate"), Gary, Richard, Sandra, Dianne, and Deanna as defendants. In the complaint, and amended complaints, Grace alleged: (1) breach of contract, conversion, breach of fiduciary duty, negligent misrepresentation and fraud against the Estate and the Cowlings, (2) declaratory judgment to establish a constructive trust and an action for accounting against the Cowlings, and (3) civil conspiracy and civil aiding and abetting against the Estate and Gary.
 {¶ 7} The Estate did not answer the complaint or the amended complaints. Grace later moved for default judgment against the Estate on the counts for breach of contract, conversion, breach of fiduciary duty, negligent misrepresentation, and fraud, but not on the claims for civil conspiracy or civil aiding and abetting. The default motion was granted during trial after a jury had determined damages in Grace's favor against the Estate for $255,354.00.
 {¶ 8} On October 15, 1999, the Cowlings moved for partial summary judgment on all claims, except accounting and constructive trust. The trial court granted partial summary judgment for Richard, Dianne, Deanna, and Sandra, but it denied the motion with regard to Gary. Thus, the claims remaining were: (1) against Gary, Richard, Sandra, Dianne and Deanna, claims for declaratory judgment to establish a constructive trust and for an accounting, and (2) against Gary and the Estate claims for civil conspiracy and civil aiding and abetting, breach of contract, conversion, breach of fiduciary duty, negligent misrepresentation, and fraud.
 {¶ 9} The parties filed a joint stipulation of facts with the trial court on January 25, 2001, regarding the Assets. The parties stipulated that Grace and Garnard held: 1) as of June 1973, 705 shares of Amherst Manor stock (Grace separately owned 615 shares, Garnard separately owned 88 shares and both jointly owned 2 shares); 2) as of 1989, 495 shares of Kuhlman Corporation stock ("Kuhlman stock"), as joint tenants; 3) as of 1993, 380 shares of PNC Financial Corporation stock ("PNC stock"), as joint tenants; 4) as of 1995, 3,254 shares of CoBancorp stock, as joint tenants, which was worth approximately $142,363 on February 8, 1998; and 5) a house located at 572 Beech Street, Amherst, Ohio, as joint tenants. The parties further stipulated that Garnard maintained a transfer on death account at Edward Jones and that said account was valued at $182,995.69 on February 8, 1998; the assets contained in the account passed to Gary, Sandra, and Richard upon Garnard's death.[7]
 {¶ 10} A trial was held on the remaining counts against the Cowlings and the Estate.[8] Upon the close of Appellee's case, the Cowlings orally moved for a directed verdict on the claims remaining against them pursuant to Civ.R. 50. The trial court granted the motion on the claims against Gary for breach of contract, conversion, breach of fiduciary duty, negligent misrepresentation, fraud, civil conspiracy and civil aiding and abetting, but denied the motion on the claims against the Cowlings for an accounting and constructive trust.
 {¶ 11} At the time the jury received the case there was pending unopposed Appellee's motion for default judgment against the Estate on the claims for breach of contract, conversion, breach of fiduciary duty, negligent misrepresentation, and fraud. The court appeared to submit all the legal claims pending against the Estate to the jury and then to grant the pending motion for default judgment against the Estate. At trial, the jury was instructed:
"The Plaintiff, Grace Cowling, claims that her late husband, Garnard Cowling, wrongfully, and without her informed consent, converted assets owned by her and Garnard jointly, to accounts in his name alone. That he then gave such assets to his children by gift and by establishing accounts that automatically transferred the assets to them upon his death. The Plaintiff further alleges that the value of the assets converted by Garnard Cowling exceed his contribution on acquiring the assets and that the withdrawal of those assets constituted * * * constituted a breach of fiduciary duty he owed to the Plaintiff."
 {¶ 12} The jury reached a verdict in favor of Grace for damages in the amount of $255,354. The trial court entered default judgment against the Estate in that amount and ordered that a constructive trust be imposed in proportion to the amount of money received by each of the Cowlings from Garnard. The Estate did not appeal. The trial court failed to specify the property on which the constructive trust would be imposed. The trial court did not enter judgment on Appellee's action for accounting. The Cowlings filed a motion for judgment notwithstanding the verdict. The trial court denied the motion.
 {¶ 13} The Cowlings appealed the trial court's judgment entry imposing the constructive trust and the trial court's entry denying the Cowlings' motions for a directed verdict and judgment notwithstanding the verdict, or, in the alternative, for a new trial. Appellee also appealed the trial court's partial granting of the Cowlings' motion for directed verdict. This Court dismissed the Cowlings' appeal and Appellee's cross-appeal on the ground that the July 27, 2001 judgment entry granting judgment in favor of Appellee did not dispose of all the claims nor did it state that there was no just reason for delay pursuant to Civ.R. 54(B). Cowling, 2002-Ohio-7312, at ¶ 11.
 {¶ 14} On January 27, 2003, the parties stipulated that the Assets received by Gary, Richard, Dianne, and Deanna were retained by them at the trial, with one-third retained by Gary and Dianne and one-third retained by Richard and Deanna.[9]
The parties further stipulated that since trial the Assets were sold in order to post cash deposits for an appeal and that Appellee's action for an accounting of the Assets is moot. On February 2, 2003, the trial court issued an order dismissing pursuant to the parties' stipulation Appellee's claim for an accounting as moot.
 {¶ 15} The Cowlings have timely appealed, asserting three assignments of error; we have consolidated their first and second assignments of error to facilitate review. Appellee has filed a cross appeal, asserting two cross-assignments of error, which have been consolidated.
 II Assignment of Error Number One
"The trial court erred in not granting a directed verdict on appellee's claim for a constructive trust."
 Assignment of Error Number Two
"The trial court erred in denying [Cowlings'] motion for judgment notwithstanding the verdict."
 {¶ 16} In the Cowlings' first and second assignments of error, they have argued that the trial court erred when it failed to grant a directed verdict on Appellee's claim for a constructive trust. They have further argued that the trial court erred in denying their motion for judgment notwithstanding the verdict on the claim for a constructive trust. This Court agrees.
 {¶ 17} Our standard of review for a trial court's denial of a motion for judgment notwithstanding the verdict is the same as that applicable to a motion for a directed verdict. Posin v.A.B.C. Motor Court Hotel, Inc. (1976), 45 Ohio St.2d 271, 275. Whether a trial court properly granted or denied a motion for directed verdict presents a question of law, which we review de novo. Schafer v. RMS Realty (2000), 138 Ohio App.3d 244, 257, appeal not allowed (2000), 90 Ohio St.3d 1472. Civ.R. 50(A)(4) provides:
"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."
 {¶ 18} A motion for a directed verdict tests the sufficiency of the evidence, not the weight of the evidence or the credibility of witnesses. Wagner v. Roche Laboratories (1996),77 Ohio St.3d 116, 119-120. In ruling on a motion for a directed verdict, the trial court must construe the evidence most strongly in favor of the non-moving party. Posin, 45 Ohio St.2d at 275. When the party opposing the motion has failed to produce any evidence on one or more of the essential elements of a claim, a directed verdict is appropriate. Hargrove v. Tanner (1990),66 Ohio App.3d 693, 695. However, where there is substantial evidence upon which reasonable minds may reach different conclusions, the motion must be denied. Posin,45 Ohio St.2d at 275.
 {¶ 19} This case involves the equitable concept of what is known as a "constructive trust," which is defined as:
"* * * [A] trust by operation of law which arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. It is raised by equity to satisfy the demands of justice. * * *" (Alterations sic; footnote added.)Ferguson v. Owens (1984), 9 Ohio St.3d 223, 225, quoting 76 American Jurisprudence 2d (1975) 446, Trusts, Section 221.
 {¶ 20} A constructive trust is simply "a remedial device for the prevention of fraud and unjust enrichment." Alteno v.Alteno (Jan. 25, 2002), 11th Dist. No. 2000-T-0078, 2002 Ohio App. LEXIS 226, at *12, quoting Bilovocki v. Marimberga (1979),62 Ohio App.2d 169, 171. Such a remedial device is not a right to recover on a debt owning, rather it creates a right to recover property wrongfully held. Dixon v. Smith (1997),119 Ohio App.3d 308, 319, citing Staley v. Kreinbihl (1949),152 Ohio St. 315. Before a court can impose a constructive trust, however, the burden is on the claimant, in this case Appellee, to "trace" the wrongfully converted property. Dixon,119 Ohio App.3d at 320; see, also, State ex rel. Marietta v. Groves (Aug. 9, 1985), 4th Dist. No. 84 X 7, 1985 Ohio App. LEXIS 8557, at *5 (stating that "Ohio follows the majority rule that there must be tracing.")
 {¶ 21} The law in Ohio regarding "tracing" in the context of constructive trusts is not extensive. However, this Court finds the decisions in Dixon, Groves, Ohio State Bank Trust Co.v. Biltwell Tire Rubber Co. (1924), 23 Ohio App. 409, 412-413, and In re Estate of Thompson (1981), 66 Ohio St.2d 433, overruled, in part, Wright v. Bloom (1994), 69 Ohio St.3d 596, and Wright instructive on the issue of tracing.
 {¶ 22} In Dixon, the plaintiff filed suit against the defendant, her ex-boyfriend. After accepting his proposal of marriage, the parties had lived together for four years before the relationship terminated without the parties having married.[10] Plaintiff brought suit for unjust enrichment and constructive trust claiming that Defendant had made a false promise of marriage. She contended that in reliance on this false promise she spent a total of approximately $73,277.18[11]
on Defendant's behalf and asked for a constructive trust on his real property.
 {¶ 23} The plaintiff contended that she and the defendant discussed developing a horse breeding/boarding business on the defendant's property. After moving in to live with the defendant, and in anticipation of marriage and joint operation of the horse breeding venture, the plaintiff took out a first mortgage in the amount of $18,750 on rental property she owned free and clear of any encumbrances. She deposited the $18,750 into the parties' joint checking account. She asserted that the entire amount was spent on improvements to the defendant's property.
 {¶ 24} When the plaintiff moved into defendant's home the house had one bedroom and two bathrooms. Eight months later, two bedrooms and one bathroom had been added and the property value had increased from $119,000 to $132,000. Several years later the home was valued at $176,200.
 {¶ 25} Plaintiff submitted evidence of the increase in value to the home. She also submitted check registers, cancelled checks, and stipulated summaries to document each expenditure made to complete the improvements to the home. The plaintiff testified that in addition to the $18,750 she contributed for home improvements, she deposited another $100,506 into the couple's joint checking account and of that amount she used $54,527.18 to pay the defendant's debts. When the plaintiff finally terminated the relationship and moved out of the defendant's home, the joint checking account contained $2,000 which the parties agreed to divide equally.
 {¶ 26} The defendant moved to dismiss the plaintiff's claims for unjust enrichment and constructive trust, claiming that the money was a gift and alternatively that the evidence did not support the imposition of a constructive trust by clear and convincing evidence. The trial court dismissed the claim for constructive trust but found in plaintiff's favor on her claim for unjust enrichment in the amount of $18,750. The trial court apparently felt that Plaintiff, though detailing the home improvements with check registers, cancelled checks, and stipulations, had not sufficiently traced her $18,750 into the home improvements for the purpose of imposing a constructive trust on the home. However, given the judgment for unjust enrichment (relief based not on a constructive trust theory, but on defendant's false promise of marriage), the Plaintiff could assert a judgment lien against the defendant's property and recover the $18,750 in a foreclosure action.
 {¶ 27} The defendant appealed and the plaintiff cross-appealed. In the plaintiff's cross-appeal, she argued that the trial court erred in denying her claim for a constructive trust against the home for the $54,527.18 of her money she contended was spent on defendant's debts. Plaintiff did not appeal the denial of a constructive trust for the $18,750; rather, she appealed the trial court's failure to grant her prejudgment interest on that amount. In reviewing the plaintiff's arguments, the Dixon court explained that "tracing is fundamental to a constructive trust" and it described the method of tracing required to impose a constructive trust. Dixon,119 Ohio App.3d at 320. Because a constructive trust creates a right to property wrongfully held, the court explained that "a trust will follow property through all changes in its state and form so long as such property, its product, or its proceeds are capable of identification." Id. at 320.
 {¶ 28} Here, despite the detail of the check registers, the cancelled checks, and information in the stipulated summaries, the plaintiff only claimed to have spent the money on defendant's debts and otherwise failed to meet her burden of proof to trace the $54,527.18 she claimed that she spent on the defendant's behalf from the joint checking account into the "res" (i.e., the defendant's home/real property) on which she asserted a constructive trust. Thus, the appellate court in Dixon rejected the plaintiff's claim that because her $54,527.18 was available in the joint checking account it must have been used in a manner which directly improved defendant's property or relieved him of debt collateralized by his property.
 {¶ 29} Similarly, in Groves, supra, the appellate court explained that tracing is the "sine qua non of constructive trust." Groves, 1985 Ohio App. LEXIS 8557, at *4. In Groves,
the court had to decide whether the trial court erred in imposing a constructive trust on assets embezzled by one (the wife) and held by another (the husband). Mrs. Groves embezzled approximately $116,758 from the city income tax department and confessed her crimes in a suicide note. The trial court found that Mrs. Groves' widower was unjustly enriched by her contributions to their mutual living expenses. The trial court then imposed a constructive trust for $21,758 on the Groves' jointly owned home — the unstated inference being that $21,758 of the stolen money was applied to the benefit of the widower by payment of any mortgage or repairs/improvements to the home. The appellate court rejected such an inference.
 {¶ 30} On appeal, the appellate court reversed the trial court's decision because the embezzled money was not adequately traced to any identifiable fund. Groves, 1985 Ohio App. LEXIS 8557, at *5. It held that the burden was on the claimant to show that the money taken was not dissipated, but was used in acquiring specific property. The court explained that "one reading the record is left to wonder what [the wrongdoer] did with the money she stole." Id.
 {¶ 31} In Groves there was no dispute over the actual ownership of the $116,758 embezzled by the wife. It was not her money. Groves is simply a case about tracing money stolen by the wife as to which neither she nor her husband had any legitimate interest. However, Groves does stand for the proposition that "tracing" (i.e., the specific showing of an asset-to-asset nexus between the property taken and the "res" upon which to impose the constructive trust) cannot be legally accomplished with a simple showing that the wife had $116,758 "available" to commingle with her wages and other funds held in common with her innocent husband Thus, in accordance with the logic expressed in Groves, the theory of "availability," or a showing that certain funds were available for use without proof that the funds were actually used to acquire the specific res upon which the claimant intends to impose the constructive trust, is insufficient for the imposition of a constructive trust.
 {¶ 32} Additionally, we find the decision in Biltwell Tire,
instructive on the matter of tracing. In that case, the appellate court explained that:
"Where it cannot be established into what property the trust property has been converted, and therefore it cannot be identified in its substituted form, and it is attempted to have a trust declared in property with which it is claimed the trust property has been indistinguishably mixed, and the rights and equities of third parties are involved, there must be proof of some specific property with which the trust funds were mixed; mere use in one's business is not sufficient. Ability to trace the trust property is essential — in the one case into the property into which it has been converted, and in the other case into the property with which it has been mixed.
"If I receive $100 in money in trust, and buy a cow with it, I convert the property into other property, and the rule first stated above applies; if I place the trust money so received with my own money, either in my pocket, or in my money drawer, or in my bank account, so as not to be able to distinguish my money from the trust money, I mix the trust property with my property, and the second rule applies. In both instances the property to which the trust attaches can be identified — in the one case, the cow; in the other, the money mixture. But if I become insolvent, and neither such cow nor any part of such money mixture is in existence, and such trust funds cannot be further traced or identified, then there is no property which can be declared to be trust property." (Emphasis sic; citations omitted.) BiltwellTire Rubber Co., 23 Ohio App. at 412-413.
 {¶ 33} We come now to the Ohio Supreme Court's decision inThompson, supra, which held:
"A joint and survivorship account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent." Thompson,
66 Ohio St.2d at paragraph one of the syllabus.
 {¶ 34} In Thompson, there were two accounts held jointly, with survivorship rights, by Richard Thompson and his wife. Richard closed both accounts and transferred the funds into two new accounts in his name only.[12] The next day he was served with divorce papers, and his wife sought a restraining order to prevent Richard from withdrawing any funds from the two joint and survivorship accounts. She died soon thereafter. Her daughter filed a probate inventory, which included two unliquidated claims against the husband as constructive trustee for one-half of the amounts that had been in the joint and survivorship accounts.
 {¶ 35} Richard testified that the two accounts had consisted largely of his contributions. He testified that he told his wife not to take money out of these accounts and that he retained sole control over the passbooks. He also admitted that the accounts "belonged to both of them" and that they were intended as safekeeping to be used by his wife in the event of his death or illness. Id. at 434.
 {¶ 36} The Court held that Richard's admission that the accounts "belonged to both of them" did not exhibit an intent to make his wife a present co-owner of the accounts. Thompson,66 Ohio St.2d at 434. Rather, it reflected his intention to give her only a survivorship interest.[13] The Court concluded that the husband was entitled to withdraw from the joint accounts that amount which was proportionally attributable to his contributions to those accounts. Id. at 440. The court further found that "[a] constructive trust [could] be imposed over any amounts withdrawn which exceeded those amounts attributable to [the husband's] contributions." Id. The court then remanded the matter for a determination as to what proportion of the net contributions to the joint savings account was attributable to the wife. Id.
 {¶ 37} Although later overruling part of the holding inThompson, the Ohio Supreme Court in Wright specifically noted that: "We stress, however, that today's decision does not change the ownership-during-lifetime presumption set forth inThompson, [69 Ohio St.3d] at paragraph one of the syllabus, utilized in determining the rights of the parties and others to joint and survivorship funds in controversies arising during the parties' lifetimes." (Alterations sic.) Wright,69 Ohio St.3d at 607.
 {¶ 38} Therefore the decision in Thompson is still good law with regard to the proposition that "during the lifetime of the co-owners of a joint and survivor account, it is presumed that, absent evidence of another intent, funds in the account belong to the co-owners in proportion to the net contributions each has made to the account. * * * A constructive trust may be imposed on any amounts withdrawn by a co-owner in excess of [his] contributions." (Citations omitted.) In re Estate of Mayer
(1995), 105 Ohio App.3d at 486.
 {¶ 39} The dissent in the instant matter contends that the Ohio Supreme Court has overlooked, rather than replaced, a former presumption of equal ownership and that "availability" tracing is sufficient to determine Grace's contribution to the Assets. However, to adopt the position of the dissent that, in cases seeking a constructive trust, there is an initial presumption of "equal shares" (which can then be rebutted by evidence of the "realities of ownership" during the lifetime of the joint owners) is to ignore the express new presumptions set forth in Thompson
and later expressly reaffirmed in Wright.[14] Thompson,66 Ohio St.2d at 436, citing Vetter v. Hampton (1978),54 Ohio St.2d 227.
 {¶ 40} To the extent the dissent relies upon Cork v. Bray
(1990), 52 Ohio St.3d 35, that reliance is misplaced. FirstWright is subsequent to Cork. Second Cork is factually distinguishable. Cork was a post-death probate dispute. InCork husband and wife held assets jointly with rights of survivorship. After the husband died the wife by law took separate ownership of 100% of the assets formerly held jointly. Later the wife put all of these separately owned assets in joint and survivorship accounts to which the co-owner contributed nothing. The wife died while the joint and survivorship accounts were still intact. After her death further disputes arose regarding the proper disposition of these assets.
 {¶ 41} Cork addressed the second, post-death presumption ofThompson in resolving these disputes. Cork did not expressly reject or modify the first holding of Thompson regarding the "net contribution" presumption. Moreover, a close reading ofCork reveals that Cork's apparent assertion (see Cork,52 Ohio St.3d at 37 — that portion of Cork upon which the dissent relies) that Thompson actually stood for a presumption of equal ownership subject to rebuttal by the "realities of ownership" is mistaken. In actuality, Thompson was describing Ohio lawbefore Thompson abandoned the former presumption of equal ownership. Citing to Thompson, Cork states: "Joint and survivorship accounts create by contract both a survivorship interest and a present joint interest. * * * The presumption of equal ownership of the funds on deposit may be rebutted by a showing of the `realities of ownership.'" (Citations omitted.)Cork, 52 Ohio St.3d at 37.
 {¶ 42} But in actuality, Thompson said the following: "Joint and survivorship accounts, however, are frequently utilized without their legal ramifications being fully understood by their creators. As a result this court has held that the creation of such accounts raises a rebuttable presumption that the parties to the account share equally in the ownership of the funds on deposit, allowing the presumption to be rebutted by a showing of the "realities of ownership." (Citations omitted; emphasis added.) Thompson, 66 Ohio St.2d at 436. Thompson
continues: "The case at bar illustrates a common problem with this approach." Id. And notes: "[A]ny presumption made must reflect the intent of the average creator of joint and survivorship accounts. * * * `Presumptions conform to the commonly accepted experiences of mankind and the inferences which reasonable men would draw from such experiences.'" (Citations omitted.) Id at 438. After explaining the defects in the equal presumption approach, Thompson then adopts Uniform Probate Code Sections 6-103(a) (inter vivos presumption of "net contribution") and 6-104(a) (post death presumption in favor of the surviving joint tenant(s) against the estate of the deceased joint tenant). Id. at 438. Thompson states: "We hold that the presumptions created in these two sections accurately reflect the common experiences of mankind in regard to joint and survivorship accounts. As a result, we adopt these specific sections as the law of this state." Id at 439.
 {¶ 43} After an exhaustive summary of Ohio law on the subject of assets held jointly, Wright expressly stated that "[the court in Thompson] changed the [former] burdens and presumptions [to those of present equal shares subject to the rebuttable presumption of the realities of ownership.]" (Emphasis added) Wright, 69 Ohio St.3d at 601. Wright continued: "The court [in Thompson] adopted the presumptions embodied in the Uniform Probate Code over the previous presumptions[.]" (Emphasis added) Id. at 602. The words "over" and "previous" clearly express the court's intention to replace the "equal share" presumption with the "net contribution" presumption.
 {¶ 44} Moreover, the "net contribution" presumption contains a provision for rebuttal by showing the actual intent of the parties at the inception of the joint account, and presumably any change of intent before the death of a joint owner(s). Under present Ohio law, the burden of proving "net contribution" or its rebuttal would fall on the claimant, in this case upon Appellee, and not on the Cowlings as suggested by the dissent. Thus, we believe that the Ohio Supreme Court has already rejected the position of the dissent that Grace be presumptively deemed the owner of "equal shares" (i.e., half) of the Assets. However, we deem it necessary to discuss some of the equitable concerns raised by the dissent.
 {¶ 45} Appellee attempted to show Grace's ownership of her contributions to the Assets through the testimony of several witnesses. However, these witnesses, in spite of to their use of the word "tracing," did not trace at all. Indeed, the dissent admits as much. Appellee's witnesses simply summarized the collective assets accumulated by Grace and Garnard during their marriage. Appellee's witnesses then merely concluded that the percentage contributions of the parties to their lifetime collective holdings must necessarily also reflect the separate contributions of each to the Assets.
 {¶ 46} The dissent urges imprecise and conclusory reasoning: an "availability" theory of proving ownership that the dissent seeks to justify on grounds of equity. But, as established inDixon and Groves, mere "availability" is insufficient as a matter of law when the remedy sought is an equitable one of constructive trust. Nor should a simple theory of "availability" be sufficient to establish ownership for the purpose of proving "net contribution" during lifetime disputes over assets held jointly when the remedy sought is a constructive trust. Rather, Ohio law starts with the "net contribution" presumption adopted in Thompson.[15] That "net contribution" presumption necessarily rejects a conclusory analysis that everything in the joint asset is initially owned in equal or proportional/percentage shares. That "net contribution" cannot simply be a presumed equal/percentage share of property held jointly, with the burden shifted (as is suggested by the dissent) to the other joint owner(s) to show otherwise.[16] Such an interpretation would be no less inequitable than the result complained of by the dissent. Nor would it solve the problem raised in the first footnote of the dissent.[17] The dissent's "availability" theory would wipe out the stringent tracing of ownership that is the hallmark of a constructive trust and erase entirely the new presumption in Thompson.
 {¶ 47} Based upon the law expressed in Dixon, Groves,Biltwell Tire, Thompson and Wright, we find that in order for a court to impose a constructive trust upon wrongfully converted assets, the wronged party must first prove separate ownership of the assets alleged to have been converted. When the assets at issue concern property held jointly as is the case at bar, the claimant must specifically identify and prove separate ownership to his/her "net contribution" by clear and convincing evidence — not by availability theory or speculation and guesswork.
 {¶ 48} Thus, this Court must determine: (1) whether Appellee sufficiently demonstrated Grace's "net contribution," or alternatively the taking by Garnard of more than his "net contribution," and the value of each, and (2) whether Appellee rebutted the presumption of "net contribution" with evidence of a contrary intent of the parties at the time the joint accounts were established or thereafter.[18]
 {¶ 49} After review of the record the majority finds no evidence of actual intent or other indicia of intent sufficient to rebut the "net contribution" presumption. Accordingly, the dispositive issue in this case is whether Appellee proved Grace's and/or Garnard's initial "net contribution" into the Assets and the value of each.
 {¶ 50} Rather than starting with Grace's identifiable separate property and then tracing how Grace's separate property changed in form until it was used to purchase her "net contribution" in the Assets, Appellee's witnesses merely summarized the various assets held during the lifetime of the parties and calculated only the availability of a percentage of the collective assets which Grace could have used to purchase a portion of the Assets. This "availability" theory of showing ownership or tracing was rejected in Groves. See Groves,
1985 Ohio App. LEXIS 8557, at *5. In that case the claimant's theory was that because the wife had stolen $116,758.16 and co-mingled all or part of it into marital assets belonging to herself and her husband, the court should impress a constructive trust on the jointly held home. The appellate court rejected that theory because there was insufficient proof of what the wife actually did with the stolen money and how much of it, if any, was actually co-mingled in the marital assets and traceable to the home. Dixon also rejected the concept of availability tracing. In Dixon the plaintiff testified to her ownership of the $18,750 and other monies she placed in the couple's joint check account, totaling $100,506. However, while she traced that money into the joint checking account (showing its availability) she failed to adequately trace either the $18,750 or the $54,527.18 from the joint account to defendant's property.
 {¶ 51} The dissent asserts that Appellee met its burden to show "net contribution" by establishing the "availability" of Grace's percentage contribution to the lifetime holdings of the parties. However, we conclude that percentage availability is mere speculation and does not satisfy the specific asset-to-asset nexus that is the essential feature of a constructive trust. Such a nexus must be shown to identify the "res" (i.e., the "net contribution" to the jointly held assets) initially (in-tracing) as well as to follow the "res" after its wrongful conversion through all of its different forms so that the constructive trust can be imposed "in rem." We believe that if a "percentage availability" test were to be substituted for the specific nexus test, then the unique and special remedy of a constructive trust would become indistinguishable from other legal remedies.
 {¶ 52} In most cases involving the remedy of constructive trust the initial separate ownership of the "res" is not at issue. Most cases involve out-tracing into the hands of the wrongdoer or other innocent holders of the proceeds of the res. But the rarity of cases involving lifetime disputes over the "net contribution" (in-tracing) of parties holding joint assets where there is a claim to a constructive trust does not justify replacing the nexus test with a speculative test of mere availability.
 {¶ 53} Appellee's accounting expert, Mr. Bober concluded that Grace contributed 74% of the marital assets and thus her "net contribution" to the Assets was necessarily 74% of the value of the Assets. However, on cross-examination, Mr. Bober admitted that he did not know the source of the funds for the purchase of the Kuhlman stock, PNC stock or the CoBancorp stock or the date on which the stock was purchased. He also testified that he did not know what assets Grace and Garnard held prior to their marriage in 1967. The evidence does show that Grace and Garnard each brought a business into the marriage. Regarding Grace's business, Amherst Manor, Appellee did offer evidence of the value when that business was sold, but failed to demonstrate what happened to the proceeds of sale and failed to trace the proceeds into any specific account, and thereafter into the "Assets." As in Groves, we are left wondering what happened to the money.
 {¶ 54} Mr. Bober may have demonstrated that Grace contributed a greater percentage of earnings during the marriage than did Garnard, but it is still not clear how and when Grace actually used these earnings to acquire the Assets. This failure to specifically explain the origin of the money used to purchase the Assets is fatal to Appellee's case for a constructive trust.
 {¶ 55} Based on the foregoing, and construing the evidence in favor of the Appellee, we find that the trial court's denial of the Cowlings motions for directed verdict and judgment notwithstanding the verdict on the claim for constructive trust was in error. The Cowlings first and second assignments of error are well taken.
 Assignment of Error Number Three
"The trial court erred in granting a money judgment against [the Cowlings] when the only claim pending against them at the conclusion of trial was for the imposition of a constructive trust over certain assets in the hands of [the Cowlings]."
 {¶ 56} In the Cowlings' third assignment of error, they have argued that the trial court erred in granting a money judgment against them when the only claim pending against them was for the imposition of a constructive trust over certain assets.
 {¶ 57} This Court has thoroughly reviewed the trial court record and we find that the trial court did not impose a money judgment against the Cowlings. The only claims submitted to the jury were those claims pending against the Estate. Because the claims for constructive trust and accounting were equitable claims, those claims could only be submitted to the trial court. Thus, the jury verdict in the amount of $255,354.00 was against the Estate only. The trial court attempted to impose a constructive trust against the Assets in the Cowlings' possession so that the funds would be available with which to satisfy the money judgment entered against the Estate. However, since no judgment was entered against the Cowlings individually, we find that the Cowlings' third assignment of error lacks merit.
 Appellee's Cross-assignment of Error Number One
"The trial court erred when it directed a verdict on a claim of civil conspiracy against gary."
 Appellee's Cross-assignment of Error Number Two
"The trial court erred when it directed a verdict on the claim of aiding and abetting against gary."
 {¶ 58} In Appellee's first and second cross-assignments of error, it has argued that the trial court erred when it granted the Cowlings' motion for directed verdict on the claims of civil conspiracy and aiding and abetting brought against Gary. This Court disagrees.
 {¶ 59} As previously discussed, in ruling on a motion for a directed verdict, the trial court must construe the evidence most strongly in favor of the non-moving party. Posin,45 Ohio St.2d at 275. When the party opposing the motion has failed to produce any evidence on one or more of the essential elements of a claim, a directed verdict is appropriate. Hargrove,66 Ohio App.3d at 695.
 {¶ 60} In a claim for civil conspiracy, a claimant must prove 1) a malicious combination, 2) involving two or more persons, 3) causing injury to person or property, and 4) the existence of an unlawful act independent from the conspiracy itself. Pappas v.United Parcel Service (Apr. 11, 2001), 9th Dist. No. 20226, at 10, citing Universal Coach, Inc. v. New York City Transit Auth.,Inc. (1993), 90 Ohio App.3d 284, 292; see, also, LeFort v.Century 21-Maitland Realty Co. (1987), 32 Ohio St.3d 121, 126
(defining civil conspiracy as "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages."). Further, "[t]he malice involved must include an action done `purposely, without a reasonable or lawful excuse, to the injury of another.'" Pappas, supra, at 10, quoting Gosden v. Louis
(1996), 116 Ohio App.3d 195, 219, appeal not allowed (1997),78 Ohio St.3d 1456.
 {¶ 61} Appellee has argued that 1) Gary's malice can be inferred from his involvement with his father's, Garnard's, conversion of Grace's assets; 2) Gary worked in concert with Garnard to deprive Grace of her assets; 3) Grace suffered damages in excess of $250,000 when Gary aided Garnard in transferring the couple's joint accounts and stocks to Garnard; and 4) by withdrawing funds in excess of his net contribution, Garnard breached his fiduciary duty, thereby establishing the existence of an unlawful act independent from the conspiracy itself.
 {¶ 62} After reviewing the record, this Court finds that the trial court did not err in granting a directed verdict on Appellee's civil conspiracy claim. Gary testified that he aided his father in his business affairs. This would generally entail Gary reading business letters or contracts to his father or driving his father to business appointments. However, the record is devoid of any evidence that Gary was involved in an unlawful act independent of the conspiracy. As stated by the trial court, the record simply shows that "any tortious act, that is the transfer of the Edward Jones account and the PremierBank and Trust assets being transferred from the joint names to Garnard Cowling alone, took place without any involvement on the part of Gary Cowling."
 {¶ 63} With regard to Appellee's claim that the trial court erred in granting the Cowlings' motion for directed verdict on the claim of aiding and abetting,[19] this Court also finds that Appellee failed to establish the essential elements of that claim. In order to prevail on a claim of aiding and abetting, Appellee had to prove: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." Guerrero v.C.H.P., Inc. (Aug. 16, 2001), 8th Dist. No. 78484, 2001 Ohio App. LEXIS 3603, at *11.
 {¶ 64} Appellee has argued that 1) Garnard, the party whom Gary was assisting, wrongfully withdrew funds from the joint and survivorship accounts; 2) Gary was generally aware of Garnard's tortious activity because he was relied upon to read business documents to Gary, and he actively participated in the transfer on death designations of the Smith Barney account and the Edward joint account; and 3) Gary knowingly and substantially assisted his father in the breach of his fiduciary duty. We reject Appellee's arguments. As previously discussed, the record reveals that Gary was not involved in Garnard's "plan" to convert Grace's assets. There is no evidence that Gary was aware of his father's intent to deprive his step-mother of property that rightfully belonged to her or that Gary knowingly assisted his father in such an endeavor. Consequently, we find that the trial court did not err in granting the Cowlings' motion for directed verdict on the aiding and abetting claim.
 {¶ 65} In sum, we find that Appellee's cross-assignments of error lack merit.
 III {¶ 66} The Cowlings' first and second assignments of error are sustained; their third assignment of error is overruled. Appellee's cross-assignments of error are overruled. The decision of the trial court, which imposed a constructive trust on unspecified property in the possession of the Cowlings, is reversed and we enter judgment in favor of the Cowlings on Appellee's claim for imposition of a constructive trust. The money being held as a security bond for this appeal is ordered released to the Cowlings.
Judgment reversed in part, and affirmed in part.
Baird, P.J., Concurs.
[1] Sandra Reddington was also named in the Complaint, but she is not a party to this appeal.
[2] Appellee contends in its brief that the "Assets" were held jointly with rights of survivorship and the Cowlings do not controvert this claim.
[3] Dr. Bischoff explained that "[d]ementia is a late in life deterioration of cognitive functioning that usually involves some type of deterioration of brain cells."
[4] The record is not clear when Grace's dementia began nor the degree of her mental impairment in July of 1996 when she signed the irrevocable stock transfers at issue. There is, however, evidence that in October 1997 Grace signed other legal papers (i.e., a trust agreement created to protect Grace's remaining assets), witnessed by her son, Donel. Grace presumably was deemed competent at that time.
[5] Grace testified at a deposition that she did not remember signing any of the transfer documents at issue. In fact, she denied that the signatures contained on the irrevocable stock transfers belonged to her. Referring to the signatures contained on the irrevocable stock transfers, Grace explained that "this is all Garnard's signatures; and he signed everything for me because he thought I didn't know enough to sign anything."
[6] Presumably Grace had the mental capacity to consult with her attorney and authorize the filing of the complaint at that time.
[7] The Edward Jones account contained, among other things, the PNC Financial Corporation stock and the Kuhlman Corporation stock.
[8] This Court notes that an action for accounting or the imposition of a constructive trust arises under equity jurisprudence. Thus, these claims against Gary, Richard, Sandra, Dianne and Deanna were presented solely to the trial court. However, the claims against the Estate were presented to the jury because such claims are actions at law.
[9] The remaining one third of the Assets was initially retained by Sandra Reddington. She has apparently returned her one third of the Assets.
[10] The defendant testified that even before plaintiff moved into his home, he had already decided not to marry her.
[11] As discussed infra, the plaintiff claimed to have contributed the proceeds of a mortgage loan on her property ($18,750) and an additional cash contributions totaling $100,506 to a joint checking account. She claimed that $18,750 was spent on improvements to the defendant's home and that $54,527.18 of the $100,506 was spent on the defendant's debts. Thus her total claim against the defendant was for $73,277.18.
[12] Thompson is therefore factually on point with the instant matter where the joint and survivorship accounts between spouses was terminated during the marriage and before the death of one of the spouses.
[13] Thompson did not expressly discuss which party had the burden of proof to show "net contribution." However, the law of constructive trusts puts that burden on the claimant, the party seeking to impress property with a constructive trust.
[14] We note that under Ohio law until a divorce or legal separation is granted and a division of property made the parties to the marriage retain separate ownership of their own property. Unlike California, Ohio is not a community property state. Thus in the instant matter there is no presumed "marital" half interest in the "Assets."
[15] This Court further notes that the trial court did not instruct the jury on the theory of "availability" espoused by the dissent. Rather, the trial court instructed the jury that "[a] joint and survivorship account belongs, during the lifetime of the parties, to the parties in proportion to the net contributions of each, unless there is clear and convincing evidence of a different intent."
[16] Such a shift in the burden of proof is unsupportable because co-owner would have little incentive to take on the task of proving the case for the claimant.
[17] The burden of tracing is on the claimant. As in many other disputes, the party with the burden of proof often fails for the simple reason that the evidence needed never existed, was not offered into evidence, or has been otherwise lost. Such realities do not, and should not, justify an abandonment of the asset-to-asset nexus tracing that is part of Ohio law on constructive trusts.
[18] The issue in this case is "in-tracing" and not "out-tracing" from the Assets. The parties have stipulated to the out-tracing and that the Assets were converted into cash in order to post bond for this appeal. Thus, if all elements of a constructive trust had been proven by Appellees, this Court could impose a constructive trust on the cash being held by the Clerk of Courts as an appeal bond.
[19] We reach this assignment of error on its merits, but do not concede that under Ohio law there is a valid cause of action for "civil aiding and abetting." However, because the Cowlings never challenged the validity of such a cause of action in the court below we need not address this issue.