[Cite as *Given v. Whirlaway Corp.*, 2022-Ohio-2251.]

| | | |
|---|---|---|
| STATE OF OHIO | )<br>)ss: | IN THE COURT OF APPEALS<br>NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| | |
|---|---|
| TAMARA GIVEN | C.A. No.     21CA011791 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT<br>ENTERED IN THE |
| WHIRLAWAY CORPORATION, et al. | COURT OF COMMON PLEAS<br>COUNTY OF LORAIN, OHIO |
| Appellants | CASE No.     19CV199160 |

## DECISION AND JOURNAL ENTRY

Dated: June 30, 2022

SUTTON, Judge.

{¶1}   Appellant Whirlaway Corporation appeals from the trial court's denial of motions for directed verdict and judgment notwithstanding the verdict, as well as the trial court's ruling regarding a proposed jury instruction.  For the reasons that follow, this Court affirms.

I.

**Relevant Background**

{¶2}     Tamara Given, an employee of Whirlaway Corporation for approximately 26 years, filed a  workers' compensation report of incident and injury on July 24, 2018, regarding ongoing "[l]eft hand, numbness, tingling.  Right shoulder, numbness, burning. Left hand, right shoulder." Ms. Given identified the cause of her symptoms as "[h]and gaging, unpacking product, running [machine]. * * * Repetitive on handling product."  That same day, during her initial workers' compensation examination at Mercy Occupational Health Center, Ms. Given described the problem as follows:

Patient states [she does] repetitive hand gaging at work and [has] been experiencing numbness in left hand for months and now it's starting in the right hand as well. Pain in [right shoulder]."

Ms. Given was preliminarily diagnosed as having an "[i]njury of median nerve at wrist and hand level of left arm[,]" and "[s]train of other muscles, fascia and tendons at shoulder and upper arm level, right arm[.]" The medical notes describe both pain located in Ms. Given's left hand, and "right shoulder, neck." The visit summary, provided to Whirlaway Corporation, also indicates "[t]he diagnosis is not yet clear-further testing will be necessary." As a result of this examination, Ms. Given was prescribed medication and put on restricted duty, with a follow-up appointment scheduled in a few weeks.

{¶3} On August 7, 2018, at Ms. Given's follow-up appointment, the visit summary indicates "[n]o significant improvement," and calls for an electromyography study ("EMG"), physical therapy, and continued restrictive duty. Further, the visit summary explains, "[t]he cause of this problem is related to work activities." Additionally, the summary from the visit on August 24, 2018, notes "tenderness along the right trapezius muscle and superior shoulder and posterior lateral neck muscles." The September 7, 2018 visit summary states:

"No better[.]" Questioning if there is any benefit in continuing PT and taking daily Meloxicam. Discussed referral to ortho for opinion. Will hold PT (only 2 sessions remained) and she will stop Meloxicam since it is not working. * * * There has been no changes in the examination. [Ms. Given's] symptoms are difficult to assess because there are generalized areas that involve[] the posterior superior shoulder, lateral neck, [and] the trapezius muscle on the right. There is absolutely no change according to [Ms. Given] despite medical treatment which included [Meloxicam], PT, E-stim, traction.

{¶4} Ms. Given was then referred to Merun K. Elyaderani, M.D., at Orthopaedic Associates, Inc., who diagnosed her with cervical strain with significant muscle spasm. In so doing, Dr. Elyaderani prescribed a muscle relaxant and over-the-counter anti-inflammatories, and recommended use of a soft collar with continued aggressive therapy. Further, Dr. Elyaderani

referred Ms. Given to a spine specialist and recommended obtaining a magnetic resonance imaging (MRI) study prior to her cervical spine evaluation.

{¶5} The MRI, administered on October 5, 2018, showed a small disc bulge to the right, mild left and moderate right uncovertebral hypertrophy, and moderate right neuroforaminal stenosis at the C5-C6 vertebra level. Ms. Given then began treating with Brian Bennett, D.C., at Evergreen Pain Management & Rehabilitation, who assessed her as having "large trigger points noted through the right trapezius and right levator scapula that upon palpitation did cause referral in the right shoulder as well as into the right side of the neck." Dr. Bennett ultimately diagnosed Ms. Given with right sided neural foraminal stenosis and substantial aggravation of pre-existing C5-C6 degenerative disc disease, which he attributed directly to Ms. Given's work activities at Whirlaway Corporation.

{¶6} The Bureau of Workers' Compensation allowed Ms. Given's injury claim for strain of muscle/fascia, tendon at right shoulder/upper arm, and strain of unspecified muscle/fascia/tendon at left wrist/hand level. Ms. Given then requested additional allowances for cervical strain, right sided neural foraminal stenosis, and substantial aggravation of pre-existing degenerative disc disease at C5-C6. At a hearing on May 15, 2019, the district hearing officer allowed the additional conditions in Ms. Given's claim. Whirlaway Corporation appealed and a staff hearing officer modified the previous order by allowing Ms. Given's additional claim for cervical strain, and disallowing Ms. Given's additional claims for right sided neural foraminal stenosis and substantial aggravation of pre-existing degenerative disc disease at C5-C6. Pursuant to R.C. 4123.511(E), the Industrial Commission determined not to hear Ms. Given's appeal. Ms. Given then filed a timely appeal in the Lorain County Court of Common Pleas.

**The Jury Trial**

{¶7}     On August 9, 2021, a two-day jury trial commenced on Ms. Given's appeal. Ms. Given testified regarding her claims, and the videotaped testimony of Dr. Bennett, Ms. Given's expert witness, was played for the jury.  Further, Whirlaway Corporation presented the expert testimony of Richard J. Reichert, M.D., also by videotape.

{¶8}     Ms. Given testified she is 46 years old, married with three teenagers, and enjoys the outside, her two dogs, planting flowers, working in the yard and taking care of her family.  Ms. Given graduated high school and then attended a vocational school.  Ms. Given indicated she has worked at Whirlaway Corporation for 26 years and likes her job as a machine operator.  Further, Ms. Given stated she works five to six, and sometimes seven days per week, from 6 a.m. until 4 p.m.  Ms. Given explained Whirlaway Corporation requires its employees to work 50 hours per week.  Ms. Given described her job duties as follows:

* * *

My responsibility at Whirlaway [Corporation], a machine operator, and in 2018 I had five work stations that I was responsible for, and the first work station was * * * retrieving boxes off of my skid that would come in, and then I'd have to put it up on a table, and unload that box, 48 pieces each a box, so probably with that station like 2,000 pieces a day[.]

So then I unload those pieces for first and second shift.  And that way they're ready to run and they have product waiting for them.

The second area is the tumbler[.]  [I] have to throw those in, and there's some space away from where my conveyer is, but I have to take * * * pieces out of there, probably * * * a thousand pieces a day[.]  That tumbles for an hour.

While that's working, I have another area[.] * * * [W]hen those are completed for their hour cycle time I have to lift them up and put them into a washer. * * *

My next area is safe launch, which * * * is all those parts have to be hand-gauged before they go to the verification machine.  It was a new job, machine, so the customer requires that they're all hand-gauged.

* * *

I have to wipe the parts off that come out of the wash, I have to make sure they're dry, because if they're not, they will reject, and then I have to do it all over again.

So you try your best to have dry parts go into the [verification machine]. Once they go into the [verification machine] and ran at the end, I have to * * * [hand] gauge the pieces, and it could be 1,600 pieces a day that I do, and then I box them up and put them on the skids.

So, at the time we didn't have carts that were at your level, so it was a lot of putting down, lifting up, putting down, lifting up. And then this is what I do all day long.

So I'm a robot all day long just walking in my circle, and, you know, doing my parts, doing my tumbler. I got the wash, I got, you know, wipe off.

Then I also have another part, once I'm done with the [verification machine], I go to the linear station and they have three knobs on the top of the round part and I have to stand there and hold a gauge up and down while I check the three gears on those pieces.

So, on a good day, * * * 1,500 parts I do on that. So, a lot of repetitious movements that I do on a ten hour shift[.]

* * *

{¶9} Additionally, as to the pain Ms. Given was experiencing in 2018, she explained:

It was to the part where I was doing my safe launch, and that's where you do the three gauges, and I just, my shoulder, like I couldn't take it [anymore], it was like I couldn't gauge one more part. I just couldn't keep doing it, * * * my hand kept going numb, tingling, I'm getting this burning in my shoulder.

And I went to my human resource [officer], and just told her like, my shoulder's killing me, my hand's killing me, you know, and she said it's time to go see a doctor. So that's what I did and I followed what they had told me to do and I'm here today[.]

Ms. Given further testified she had been experiencing the burning on her ride side for approximately five months prior to reporting it to human resources. According to Ms. Given's testimony, physical therapy aggravated these issues even more. Ms. Given also testified the repetitive movements necessary for performing her work caused these issues and, although she likes to "work" be "active" and "happy[,]" she has not "been those things in a couple years." On cross examination, Ms. Given admitted that, on July 24, 2018, she could not "keep doing [it], [she]

was killing [herself]." Finally, on redirect examination, Ms. Given clarified her initial complaint to human resources regarding her right shoulder referred to her trapezius muscle, her "whole shoulder-piece[,]" and her pain relating to these claims began in 2018.

{¶10} Dr. Bennett, Ms. Given's expert witness and treating physician, testified neural foraminal stenosis "can develop from chronic repetitive stressors." Further, Dr. Bennett explained "you can develop degenerative changes throughout the course of your life and certain things will cause them to become substantially aggravated." Dr. Bennett testified:

> if you didn't have the complaints and you've been doing just fine living your normal life beforehand and something's bringing them on, certain activities, whether it's something like a repetitive motion, a lifting motion or reaching motion, that's one good indication that something may be going on there.

Additionally, on her first office visit on November 14, 2018, Dr. Bennett noted:

> [Ms.] Given stated that she worked as a machine operator, for, at that time, approximately 23 years for Whirlaway [Corporation] performing repetitive-type actions, including lifting parts and putting them into and taking them out of a machine. As a result, [Ms. Given] reported that she began to progressively have increasing pain through the right shoulder and left wrist dating back to January of 2018.

{¶11} Based upon Dr. Bennett's examination and treatment of Ms. Given, along with her subjective complaints of pain, burning, tingling and restricted motion, and objective findings, such as reports from other physicians, X-ray, and MRI results, Dr. Bennett diagnosed Ms. Given with right sided neural foraminal stenosis and substantial aggravation of pre-existing C5-C6 degenerative disc disease. Further, Dr. Bennett indicated Ms. Given's diagnosis is directly related to her work activities at Whirlaway Corporation because "[s]he's been doing repetitive-type activity for 25-plus years at this point in time and predisposing her neck to the complaints."

{¶12} Dr. Reichert, Whirlaway Corporation's expert witness, testified he devotes 80% or more of his practice to providing second opinions, or independent medical evaluations, for clients

such as the Industrial Commission. Further, Dr. Reichert admitted he only examined Ms. Given on one occasion; April 23, 2019. Dr. Reichert also reviewed Ms. Given's medical records and Workers' Compensation documents. Based upon the examination and records, Dr. Reichert opined Ms. Given, in fact, has the conditions of right-side neural foraminal stenosis and degenerative disc disease at C5-C6. Dr. Reichert, however, concluded these conditions were not related to Ms. Given's repetitive work duties. On cross-examination, Dr. Reichert admitted he had not reviewed any of Ms. Given's medical records prior to July 24, 2018. Further, when Ms. Given orally provided Dr. Reichert with her medical history, Ms. Given did not indicate she had prior issues with right-side neural foraminal stenosis or her neck at the C5-C6 level.

{¶13}  The jury returned verdicts in favor of Ms. Given. In so doing, the jury found by a preponderance of the evidence that Ms. Given is entitled to participate in the benefits of the Bureau of Workers' Compensation for the conditions of: (1) right-side neural foraminal stenosis; and (2) substantial aggravation of a pre-existing degenerative disc disease at C5-C6.

## Motions for Directed Verdict and Judgment Notwithstanding the Verdict

{¶14}  After the close of Ms. Given's case, Whirlaway Corporation moved for a directed verdict arguing Ms. Given failed to present evidence that her injuries arose during a "discernable specific time period[,]" or a "relatively narrow time frame."[1] In making this argument, Whirlaway Corporation relied upon a recent Eighth District Court of Appeals decision, *Day v. Rochling-glastic Composites, L.P.*, 8th Dist. Cuyahoga No. 108532, 2020-Ohio-1027. The trial court, in denying the motion, stated, in relevant part:

---

[1] Whirlaway Corporation provided the trial court with a written motion for directed verdict, as well as making an oral argument regarding the same. The written motion for directed verdict, however, was not made part of the record on appeal.

\* \* \*

Once the worker, [Ms.] Given, had symptoms she complained and [] they were investigated.  The symptoms have not apparently gone away, have not stopped, so that the period of time in which she was injured, from my vantage point, would be the time that she had symptoms.

And she couldn't complain of something that occurred before she had a problem.

And then the evidence apparently has shown, at least there's \* \* \* testimony that had she had some kind of nonwork-related congenital problem there would have been disc disease all over the place.  Instead it was in \* \* \* an area which was apparently consistent with the originally granted condition, the C5-C6 area, and then the foraminal stenosis in that area.

\* \* \*

But right now unless there's something in [*Day, supra*] that \* \* \* makes it [] a requirement that there be a specific injury, like an impact that occurs on a certain date, then the only other type of injury is an injury that occurs over time as long as it's work-related, and to me it would seem totally unfair to throw a case out because the injury was a result of multiple microtraumas, as opposed to one major trauma, and I think it's likely going to be a jury question as to whether or not they find that there was substantial aggravation.

\* \* \*

You know, the statute provides that injury is anything, whether caused by external accidental means, accidental in character or result, received in the course of and arising out of the injured employee's employment, and I think there's been evidence that that's the case between the description of her job, given by [Ms. Given] herself and Dr. Bennett's testimony that, over time, this caused symptoms.

And one could say as was the statement in the *Day* case that it's a certain point the straw that breaks the camel's back is the day when [Ms. Given] has symptoms, which is what I was getting at earlier.

[Ms. Given] reported the symptoms immediately and was sent for treatment and followed through with the treatment.

I don't understand the Workers' Compensation law to require a specific window of which the injury must occur, whether it's within the first five days or five months or five years or 15 years of work.  As long as it is work-related, and not some other cause.

\* \* \*

I'm not saying that anyone who gets arthritis is entitled to compensation just because they also have a job; here we have evidence that connects the specific activities of [Ms. Given's] work experience with the specific diagnosis of the injury.

* * *

At the close of Whirlaway Corporation's case, Whirlaway Corporation again renewed its motion for directed verdict, making the same arguments. The trial court denied Whirlaway Corporation's renewed motion. Finally, after the jury returned the verdict in favor of Ms. Given, Whirlaway Corporation made an oral motion for judgment notwithstanding the verdict, which the trial court also denied.

{¶15} Whirlaway Corporation now appeals raising two assignments of error for our review.

II.

**ASSIGNMENT OF ERROR I**

**THE TRIAL COURT ERRED IN REFUSING TO DIRECT A VERDICT IN FAVOR OF WHIRLAWAY [CORPORATION] AND REFUSING TO GRANT [WHIRLAWAY CORPORATION'S] MOTION JNOV BASED UPON THE FAILURE OF [MS.] GIVEN TO PROVIDE ANY EVIDENCE OF A GRADUALLY DEVELOPING INJURY AS DEFINED BY OHIO CASE LAW.**

{¶16} In its first assignment of error, Whirlaway Corporation argues the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict. Specifically, Whirlaway Corporation claims Ms. Given failed to submit sufficient evidence she suffered an "injury" pursuant to R.C. 4123.01. For the following reasons, we disagree.

{¶17} The standard for granting a motion for judgment notwithstanding the verdict pursuant to Civ.R. 50(B) is the same as that for granting a motion for a directed verdict pursuant to Civ.R. 50(A). *Wagner v. Roche Laboratories*, 77 Ohio St.3d 116, 121 (1996), fn. 2, citing

*Gladon v. Greater Cleveland Regional Transit Auth.*, 75 Ohio St.3d 312, 318-319 (1996); and

*Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275 (1976).  Civ.R. 50(A)(4) states:

> When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

Indeed, because both motions for directed verdict and judgment notwithstanding the verdict test the legal sufficiency of the evidence, this Court reviews them de novo, with no deference to the trial court's decision.  *See Oster v. Lorain*, 28 Ohio St.3d 345, 347 (1986); *see also Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, ¶ 4.

{¶18}  R.C. 4123.01 states, in relevant part, that:

(C) "Injury" includes *any injury*, whether caused by external accidental means or accidental in character and result, received in the course of, and arising out of, the injured employee's employment.

"Injury" does not include:

(4) A condition that pre-existed an injury unless that pre-existing condition is substantially aggravated by the injury. Such a substantial aggravation must be documented by objective diagnostic findings, objective clinical findings, or objective test results. Subjective complaints may be evidence of such a substantial aggravation. However, subjective complaints without objective diagnostic findings, objective clinical findings, or objective test results are insufficient to substantiate a substantial aggravation.

(Emphasis added.)

{¶19}  In *Village v. General Motors Corp., G.M.A.D.*, 15 Ohio St.3d 129, 130 (1984), at syllabus, the Supreme Court of Ohio stated, "[a]n injury which develops gradually over time as the result of the performance of the injured worker's job-related duties is compensable under R.C. 4123.01(C)."  The *Village* Court reasoned:

The General Assembly created first a voluntary, then a compulsory, system of workers' compensation as a legislative response to the need for a sure and efficient means to compensate employees for a loss in earning potential due to an injury sustained in the course of employment. The cost of such a system was, and still is, properly taxed to the employer as an expense involved in carrying on a business. The present system of workers' compensation has proved eminently more satisfactory to both employers and employees than the common-law system of requiring injured employees to bring personal injury actions against employers.

\* \* \*

*It follows that a worker, such as appellant, does not lose entitlement to benefits merely because the onset of his work-related injury was gradual, rather than sudden.* We believe that the judicial distinction between gradual and abrupt causation is unjustified. It frustrates the purpose of the Act, which is to compensate workers who are injured as a result of the requirements of their employment. *See* Section 35, Article II of the Ohio Constitution. It also contravenes the mandate of R.C. 4123.95, which requires that the provisions of the Act be liberally construed in favor of employees and their dependents. *Whether the injury was sudden or progressive is irrelevant as long as its cause is related to the injured worker's employment.*

(Emphasis added.) *Id*. at 131-33. Notably, although the worker in *Village* suffered his injury over the course of only five days, the *Village* Court *did not* place a limitation on the time-period a gradual work-related injury could occur in order to be compensable.

{¶20} Whirlaway Corporation, however, relies upon the Eighth District Court of Appeals' decision in *Day*, *supra*, to argue that, in order to have a compensable injury, pursuant to R.C. 4123.01(C), Ms. Given "must present evidence demonstrating causal connection between the injury and work-related duties taking place over a *discernable period of time*." (Emphasis added.) The relevant facts in *Day* indicate:

[Ms.] Day started to experience shoulder pain sometime before May 30, 2014, and treated it with over-the-counter medications. However, on May 30, 2014, [Ms.] Day experienced a sharp pain in her shoulder while she was scooping resin during the early part of her shift. The pain was severe and prompted her go to the Euclid Hospital emergency room. After being treated at Euclid Hospital, [Ms.] Day followed up with Dr. Catherine Watkins-Campbell [], a medical doctor board certified in occupational medicine and family medicine.

[Ms.] Day filed a claim for her shoulder injury with the Bureau of Workers' Compensation, and the claim was approved for a right shoulder sprain/strain. She later filed an application to have the claim expanded to include subacromial impingement of the right shoulder, a partial thickness tear of the suprasinatus tendon of the right shoulder, and a superior labral anterior posterior lesion with paralabral cyst of the right shoulder. She claimed these conditions were a direct and proximate result of the performance of her work-related duties at Glastic. The Industrial Commission of Ohio denied the additional claims, and [Ms.] Day appealed to the Cuyahoga County Court of Common Pleas.

[Ms.] Day's appeal went to trial in January 2018. [Ms.] Day testified about the nature of her work, and her treating physician, Dr. Watkins-Campbell, offered expert testimony regarding the proximate cause of Day's shoulder conditions. After [Ms.] Day rested her case, Glastic made an oral motion for directed verdict pursuant to Civ.R. 50, which was denied. Glastic renewed its Civ.R. 50 motion for directed verdict before the case went to the jury, and it was again denied. After due deliberation, the jury found that [Ms.] Day was entitled to participate in the workers' compensation fund for two of the three claimed conditions (1) the partial thickness tear of the supraspinatus tendon in her right shoulder, and (2) the superior labral anterior posterior lesion with paralabral cyst of her right shoulder.

*Day* at ¶ 5-7.

**{¶21}** In affirming the trial court's denial of Glastic's motions for directed verdict and judgment notwithstanding the verdict regarding the jury's award of workers' compensation benefits to Ms. Day, the Eighth District Court of Appeals stated:

To prevail on a workers' compensation claim, the plaintiff must prove, by a preponderance of the evidence, that his or her injury occurred "in the course of, and arising out of, the injured employee's employment." R.C. 4123.01(C). In cases involving alleged repetitive motion injuries, the plaintiff must produce expert testimony establishing that his or her injury was directly and proximately caused by repetitive motions performed during the course of the plaintiff's work-related duties. *Walker v. Ford Motor Co*., 8th Dist. Cuyahoga No. 100759, 2014-Ohio-4208, ¶ 21 (Expert medical testimony is necessary to establish the proximate cause of work-related injury.). The plaintiff must also present evidence demonstrating a causal connection between the injury and work-related duties taking place over a discernible period of time. *Miller v. Emery Oil Co.*, 80 Ohio App.3d 693, 696 (12th Dist.1992); *Williams v. LTV Steel Co.*, 8th Dist. Cuyahoga No. 54947, 1989 WL 6176, * 3-4 (Jan. 26, 1989)[.]

* * *

*What constitutes a "discernible period of time" has not been defined by statute or case law as referring to any specific period to time.* In *Village*, 15 Ohio St.3d 129, 472 N.E.2d 1079 (1984), Justice Holmes noted in his concurring opinion that "[t]he accrual of the disability must relate to a discernible time which is reasonably definite and not remote." *Id.* at 135 (Holmes, J., concurring.) In *Miller*, 80 Ohio App.3d 693, 610 N.E.2d 574 (12th Dist.1992), the court concluded that the plaintiff failed to prove that her claimed injury was caused or aggravated over an ascertainable period of time because there was no evidence demonstrating that the injury "was either caused or aggravated over the course of one day, her ten years as secretary, or her eighteen total years of employment at Emery Oil." *Id.* at 696[.] Although the work-related injury at issue in *Village* developed during a five-day period, *the cases do not require the plaintiff to prove that the progressive work-related injury occurred within a specific number of days or weeks; the cases require the plaintiff to prove that the injury occurred recently during a relatively narrow time frame.*

\* \* \*

Although there was no evidence as to a specific number of days or weeks during which [Ms.] Day's shoulder pain developed, the evidence was clear that her shoulder injuries were a recent development rather than a long-standing chronic condition of unspecified duration. *There was evidence that [Ms.] Day's shoulder condition developed during a limited period of time shortly before May 30, 2014, the day the pain became intolerable.* Therefore, there was sufficient evidence establishing that [Ms.] Day's shoulder conditions were directly and proximately caused by repetitive work activities performed within a repetitive and discernible period of time.

(Emphasis added.) *Day* at ¶ 15-19.

{¶22} As a preliminary matter, we note the Eighth District Court of Appeals' decision in *Day*, *supra*, is not binding upon this Court. Moreover, inapposite to Whirlaway Corporation's argument, neither R.C. 4123.01, nor the *Village* decision, place any time-constraint on whether a worker's gradual injury is compensable under Ohio law. Specifically, in *Village* at syllabus, the Supreme Court of Ohio stated, "[a]n injury which develops gradually over time as the result of the performance of the injured worker's job-related duties is compensable under R.C. 4123.01(C)." Further, "injury" as defined in R.C. 4123.01(C), includes "any injury, whether caused by external accidental means or accidental in character and result, *received in the course of, and arising out*

*of, the injured employee's employment*." Thus, there is no apparent requirement for a worker to prove the injury occurred "recently during a relatively narrow time frame[,]" or within a "discernable period of time." *Day* at ¶ 18.

{¶23} However, assuming without deciding the Eighth District Court of Appeals accurately concluded that evidence of a "discernable period of time" is required to prove an injury, pursuant to R.C. 4123.01(C), Ms. Given presented sufficient evidence to prove her claims for the conditions of (1) right-side neural foraminal stenosis; and (2) substantial aggravation of a pre-existing degenerative disc disease at C5-C6. Specifically, the evidence shows Ms. Given has been a machine operator for approximately 26 years at Whirlaway Corporation, working 50 hours per week, doing repetitious work for her employer. Ms. Given described herself as a "robot." Ms. Given's symptoms of tingling, burning and right shoulder/neck pain arose within the first seven months of 2018. Both Dr. Bennett and Dr. Reichert testified, prior to 2018, Ms. Given's medical history did not indicate any type of issues with her shoulder/neck or cervical spine. Further, Dr. Bennett testified Ms. Given's conditions are not hereditary because she does not present with disease throughout her entire spine, but only at the C5-C6 level. Dr. Bennett also testified the repetitive nature of Ms. Given's work caused her right sided neural foraminal stenosis and substantially aggravated her degenerative disc disease.

{¶24} Moreover, similar to the facts in *Day*, Ms. Given testified she started experiencing symptoms approximately five months before she "couldn't take it anymore[,]" thus causing her to report this injury to human resources on July 24, 2018. Ms. Given described the pain on July 24, 2018, as "killing herself." As such, along with sufficient evidence that the repetitive nature of Ms. Given's work directly and proximately caused her injuries, Ms. Given also provided evidence that

her neck and cervical spine conditions developed during a specific time-frame, approximately five months prior to July 24, 2018, the day she "couldn't take it anymore." *See Day* at ¶ 19.

**{¶25}** Therefore, based upon this record, we cannot say the trial court erred in denying Whirlaway Corporation's motions for directed verdict and judgment notwithstanding the verdict.

**{¶26}** Accordingly, Whirlaway Corporation's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

**THE TRIAL COURT ERRED IN ITS REFUSAL TO GIVE THE JURY THE INSTRUCTION REQUESTED BY WHIRLAWAY CORPORATION WHICH SETS FORTH THE CRITERIA NECESSARY TO ESTABLISH A GRADUALLY OCCURRING INJURY.**

**{¶27}** In its second assignment of error, Whirlaway Corporation argues the trial court erred in refusing to give its requested jury instruction that a gradually developing injury must arise within a discernable period of time to be compensable under R.C. 4123.01(C).

**{¶28}** "A trial court is obligated to provide jury instructions that correctly and completely state the law." *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St. 3d 257, 2015-Ohio-229, ¶ 22, citing *Sharp v. Norfolk & W. Ry. Co*., 72 Ohio St.3d 307, 312 (1995). "The jury instructions must also be warranted by the evidence presented in a case." *Id*., citing *Estate of Hall v. Akron Gen. Med. Ctr*., 125 Ohio St.3d 300, 2010-Ohio-1041, ¶ 26. "The question of whether a jury instruction is legally correct and factually warranted is subject to de novo review." *Id*.

**{¶29}** In the present matter, the trial court charged the jury with regard to proximate causation and injury as follows:

**Arising out of Employment**

[Ms. Given] must prove that the employment was a direct and proximate cause of the injury. An injury arises out of employment when directly caused by something that occurred as a part of the activities, conditions and risks of the workplace. * * *

Proximate cause is something which in the natural and continuous sequence produces an injury and without which the result would not have occurred.

An injury was proximately caused if it was produced in the natural and continuous sequence of something that occurred as part of the activities, conditions and risks of the workplace.

**Injury**

"Injury" includes any injury, whether caused by external accidental means or accidental in character and result, received in the course of, and arising out of, the injured employee's employment.

It includes physical harm that is accidental and the result of an external means that is a sudden mishap, occurring by chance, unexpected and not in the usual course of events.

"Injury" need not be received in the course of, and arise out of [Ms. Given's] employment. No accident or series of accidents is necessary.

"Injury" may refer to a condition such as a loss of some function; or it may refer to an event or a series of events experienced by an employee that caused the employee's condition.

"Accidental" means unexpected, not intended and unusual.

"Accidental" includes the phrase "accidental in character" or "accidental in result." An event is "accidental in character" [when] under the circumstances, the fact that it happened was not intended and the event was unusual and unexpected. An event is "accidental in result" when the act may have been intended and expected, but the result of the act was not intended and was unusual and unexpected.

**Substantial Aggravation**

"Injury" does not include a condition that pre-existed an injury unless that pre-existing condition is substantially aggravated by the injury at work. To establish the substantial aggravation of a pre-existing condition, [Ms. Given] must produce objective diagnostic findings, objective clinical findings, or objective test results. Subjective complaints may be evidence of such a substantial aggravation. However, subjective complaints without objective diagnostic findings or objective

test results are insufficient to substantiate a substantial aggravation of a pre-existing condition.

### Natural Deterioration

"Injury" does not include an injury or disability caused primarily by the natural deterioration of tissue, an organ, or part of the body.

The record reveals, Whirlaway Corporation objected to the foregoing jury instruction because it did not include language regarding a "discernable period of time," as set forth in the *Day* decision. Whirlaway Corporation, however, did not proffer the proposed jury instruction on the record, nor did it file the proposed instruction it provided to the trial court. While we note that both parties previously filed initial jury instructions, along with their trial briefs, which *are* part of the record, those initial filings do not include the proposed jury instruction which is the subject of Whirlaway Corporation's second assignment of error. In fact, Whirlaway Corporation's initial jury instructions, which are in the record for: (1) arising out of employment; (2) injury; (3) substantial aggravation; and (4) natural deterioration mirror the OJI instructions given by the trial court.

{¶30} An appellate court's review is restricted to the record provided by the appellant to the court. App.R. 9; App.R. 12(A)(1)(b). As such, App.R. 9 places an affirmative duty on Whirlaway Corporation to provide this Court with an adequate record, or the portions necessary for review on appeal. App.R. 10(A); *Rose Chevrolet, Inc. v. Adams*, 36 Ohio St.3d 17, 19 (1998). "A presumption of validity attends the trial court's action. In the absence of an adequate record, * * * we are unable to evaluate the merits of the assignments of error and must affirm the trial court's decision." *Volodkevich v. Volodkevich*, 48 Ohio App.3d 313, 314 (9th Dist. 1989). *See also Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199 (1980).

{¶31} Without the proposed jury instruction provided to the trial court, we cannot conclude the trial court erred in refusing Whirlaway Corporation's request. *See State v. Palmison*,

9th Dist. Summit No. 20854, 2002–Ohio–2900, ¶ 39 (concluding that the appellant waived his assigned error by failing to include in the record the proposed jury instructions, thereby denying the appellate court an adequate record to review). Further, even if the proposed jury instruction had been included in the record on appeal, we note the jury instruction, as given to the jury, is an accurate statement of law.

**{¶32}** Accordingly, Whirlaway Corporation's second assignment of error is overruled.

III.

**{¶33}** For the reasons stated above, Whirlaway Corporation's two assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

 

BETTY SUTTON
FOR THE COURT

TEODOSIO, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

MARY E. ULM, Attorney at Law, for Appellant.

MICHAEL J. ZIDAR, Attorney at Law, for Appellant.

FRED S. PAPALARDO, JR., and FRANK L. GALLUCCI, III, Attorneys at Law, for Appellee.

LOUIS E. BRUBE, PAUL W. FLOWERS, and MELISSA A. GHRIST, Attorneys at Law, for Appellee.